# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1423V
UNPUBLISHED

| | |
|---|---|
| BUDDY KINDLE,<br><br>             Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>             Respondent. | Chief Special Master Corcoran<br><br>Filed: January 21, 2025 |

*Andrew D. Downing, Downing, Allison & Jorgenson, Phoenix, AZ , for Petitioner.*

*Camille M. Collett, U.S. Department of Justice, Washington, DC, for Respondent.*

## **DECISION**[1]

On October 20, 2020, Buddy Kindle filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he received an influenza ("flu") vaccine on November 1, 2017, and thereafter suffered Guillain-Barré syndrome ("GBS"). Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. For the reasons discussed below, this claim is hereby **DISMISSED**.

---

[1] Because this unpublished fact ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

### I.  Procedural History

After the claim's initiation, Respondent filed a Rule 4(c) Report opposing compensation. Respondent's Rule 4(c) Report (ECF No. 17). Petitioner thereafter filed a motion for a ruling on the record with regard to entitlement on March 10, 2023. Motion for Ruling on the Record ("Mot.") (ECF No. 25). Petitioner argues that he meets the Table requirements for GBS following a flu vaccine, or in the alternative that his injury was caused-in-fact by the flu vaccine. Mot. at 26-30.

Respondent reacted to the motion on May 4, 2023, arguing that Petitioner has not established that onset of his injury occurred within forty-two days of vaccination administration, thus preventing him from succeeding on a flu vaccine-GBS Table claim, and also that he cannot otherwise prove causation-in-fact. Response to Motion for Ruling on the Record ("Resp.") (ECF No. 26). Petitioner filed a reply on May 23, 2023, addressing Respondent's arguments. Petitioner's Reply in Support of his Motion for Ruling on the Record ("Reply") (ECF No. 28).

### II.  Evidence in the Record

Petitioner's prior history includes chronic kidney disease, hypertension, suspected hypertrophic cardiomyopathy, hypothyroidism, obesity, obstructive sleep apnea, gout, and septic arthritis of his right knee. Ex. 3 at 391, 1054, 1218; Ex. 3-2 at 579. Petitioner was 72 years old when he received a flu vaccine in his left deltoid on November 1, 2017, at the Dallas Veteran's Affairs ("VA") Medical Center. Ex. 2 at 2. The purpose of the visit was for ongoing management of Petitioner's constipation, shoulder and lower back pain, and vitamin B12 deficiency. Ex. 3 at 2180.

On November 7, 2017, Petitioner saw Dr. Kyawt Shwin, a rheumatologist, complaining of a recent gout attack on October 17th, but adding that symptoms had resolved spontaneously. Ex. 3 at 2169. In addition, Petitioner noted that he had recently withdrawn from a drug study for gout - and also complained of ongoing left shoulder rotator cuff pain during the visit. *Id.* On examination, Petitioner had no focal neurologic deficits, and Dr. Shwin restarted Petitioner on allopurinol. *Id.* at 2171.

On December 13, 2017, Petitioner visited the VA clinic to request an ophthalmology consult for chronic eye pain and discharge, nothing that "he was sent to UTSW for this problem before he was sent from eye clinic to get ophthalmology consult not optometry." Ex. 3 at 2162. That appointment took place on December 21, 2017, when Petitioner complained of "stringy mucous discharge OU since 1970s," "heavy swollen

lids," "[t]ransient (Sev minutes) horiz diplopia resolved completely by unilat occlusion, yesterday, first episode." Ex. 3 at 2151.

On December 19, 2017, Petitioner saw Dr. Rebecca Jolissaint, an audiologist with complaint about his hearing, and dizziness when standing/standing up to walk." Ex. 3 at 2158. Petitioner's history indicated that he has worn hearing aids since 2013 but that he reported he did not wear them consistently over the past four years. *Id.* At this time he also reported history of aural pain and pressure, frequent sinus/cold issues, and bilateral tinnitus. *Id.* The result of this visit was that Petitioner was to return for a new hearing aid fitting.

On December 20, 2017, Petitioner had a consult with Dr. Ugo Bitussi, a physical medicine and rehabilitation physician, for lower back pain that he reported had started ten days earlier, attributing it to bending over in the shower. Ex. 3 at 2153. Petitioner reported that as he leaned over he felt pain across his whole lower back; he "didn't feel any big issues after this," but noted that the pain had started to go down the left side of his leg. *Id.* Dr. Bitussi reviewed an MRI of Petitioner's spine taken on December 12, 2016, which showed no evidence of spinal stenosis but did show multilevel disc degenerative changes and numerous large renal cysts that were consistent with Petitioner's known polycystic kidney disease. *Id.* at 2153-2154. It was noted that Petitioner was walking with a cane, his coordination as normal, and he was able to walk both on his toes and heels and perform unilateral calf raises. *Id.* Dr. Bitussi's impression was that his lower back pain was likely due to a sprain/strain and referred Petitioner to PT for strengthening and stretching. *Id.* at 2156.

Petitioner later contacted the VA clinic on December 30, 2017, complaining of a productive cough that had been ongoing for five days. Ex. 3 at 2150. Petitioner was advised to seek additional treatment at the Dallas VA clinic or a local emergency department. Petitioner did not seek further treatment at this time because he was out of town and 120 miles away from the VA clinic and was concerned about the cost of a visit to a local emergency department. Ex. 3 at 2150.

*Treatment in 2018*

By the start of 2018, two months had passed since Petitioner's receipt of the flu vaccine - and during that period he had repeated medical encounters, but no objective evidence of any neurological symptoms that could reflect onset of GBS.

On January 2, 2018, Petitioner visited the Dallas VA clinic with complaints of a ten-day history of productive cough, associated shortness of breath, and chest pain. Ex. 3 at

3

2147. It was noted at this time he was moving well and his vital signs were stable. *Id.* Petitioner was prescribed an albuterol inhaler, antibiotics, and cough medication. *Id.*

On January 7, 2018, Petitioner called his VA clinic – and he now seemed to be exhibiting symptoms that could reflect onset of GBS. In particular, he reported a two-day history of bilateral facial numbness and weakness, and that he was feeling week and had collapsed while at a store earlier in the day. Ex. 3 at 2139-40. He indicated that he had not been taking his thyroid medication recently and was wondering if his current condition was related to his thyroid. *Id.* Petitioner was advised to seek emergency medical care. *Id.*

Petitioner drove to the VA clinic emergency department that same day and was found laying in the hospital parking lot by a Good Samaritan, who brought Petitioner into the hospital using a wheelchair. Ex. 3 at 2131. Petitioner reported that he had five falls over the past two days along with numbness in his feet and hands. *Id.* An exam revealed proximal muscle weakness in his upper and lower extremities and he was unable to stand due to weakness. The attending nurse listed a working diagnosis of myopathy and muscle weakness, thought to be secondary to Petitioner's failure to take his thyroid medication. *Id.* at 2124.

Petitioner was seen by Drs. Jafar Hashem and Meredith Bryarly on January 10, 2018, and their impression was progressive weakness, sensory loss, and loss of reflexes that were "most concerning for GBS." Ex. 3 at 2048. Dr. Bryarly observed that Petitioner was unable to count past thirteen in a single breath which was suggestive of significant diaphragmatic weakness, and that Petitioner had a positive Babinski on his right toe, and opined that his proceeding respiratory illness may have been the inciting factor of his current symptoms. *Id.* Dr. Bryarly ordered an MRI of Petitioner's cervical and thoracic spine to rule out a possible spinal court injury and a lumbar puncture to determine whether he was suffering from GBS, and he was admitted to the Critical Care Unit. *Id.* at 2020.

The following day (January 11, 2018), Petitioner reported decreased sensation on the left side of face and lack of reflexes. He also reported more difficulty breathing. Ex. 3 at 2020. Dr. Bryarly noted that Petitioner was areflexic in all extremities, and that his physical exam findings and history of a URI in December 2018 "still fit with a GBS etiology." *Id.* Due to concerns of imminent respiratory failure, Petitioner was voluntarily intubated that night. *Id.* at 2015.

Dr. Bryarly read Petitioner's January 11, 2018 EMG/NCS as an "abnormal study" that showed "electrophysiological evidence of a motor and sensory neuropathy with demyelinating features." Ex. 3 at 2307. Dr. Bryarly's impression was that these findings were consistent with the clinical diagnosis of GBS. *Id.* Accordingly, on January 14, 2018,

4

Petitioner was started on intravenous immunoglobulin ("IVIG") therapy for a presumptive diagnosis of GBS. *Id.* at 2000. On January 16, 2018, Paul Hurd, M.D., a neurologist, noted that petitioner's "progressive weakness, sensory loss, dyspnea, [and] loss of reflexes" were most concerning for GBS/AIDP. *Id.* at 1986. No spinal cord pathology was found on MRI, and petitioner's brain MRI was unremarkable. *Id.* Dr. Hurd noted that petitioner's EMG revealed absent F-waves that are typically seen in the early phase of GBS. *Id.*

On January 18, 2018, Petitioner received a fifth dose of IVIG and had a tracheostomy placed due to ongoing respiratory failure. On January 24, 2018, a CT scan showed worsening consolidation of Petitioner's pneumonia, and he also had a recurrent fever and leukocytosis, and he was placed again on antibiotic Vancomycin and Zosyn. Ex. 3 at 1919, 1938-39.

By January 26, 2018, Petitioner began to show signs of improvement, with upper extremity strength and was able to clench his hands and move his arms towards his midline. On January 30, 2018, Petitioner was evaluated and showed 5/5 upper extremity strength with 2/5 lower extremity strength and no plantar reflex movement. Ex. 3 at 1866-73. Petitioner had PT and OT consultations on January 31, 2018. *Id.*

Petitioner saw neurologist Dr. Olaf Stuve on February 2, 2018, who noted improvement, specifically in petitioner's upper extremities. Ex. 3 at 1852. Dr. Stuve indicated that there were no new recommendations other than supportive care for Petitioner's recovery from GBS, which would be a long-term process. *Id.* Petitioner also showed neurological improvement in his lower extremities by February 9, 2018.

On February 14, 2018, Petitioner was seen by Dr. Nikhil Seth, a gastroenterologist for Petitioner's complaints of handling secretions and difficulty swallowing. The possibility of surgery for implanting a PEG was discussed, but later scrapped when Petitioner began to show improved tolerance of oral feeding. Ex. 3 at 1608. By February 27, 2018, Petitioner had improved to the point where although he required a lift into a wheel chair, he was able to self-propel the wheelchair in the hospital, and that he was able to feed himself and speak with the use of a Passy Muir valve. Ex. 3 at 1621.

On March 1, 2018, Petitioner was discharged by the VA to the VA Community Living Center for inpatient rehabilitation, from March 1, 2018 to June 6, 2018. Ex. 3 at 73. He was seen again by Dr. Shwin on March 7, 2018, for gout management. Petitioner indicated his legs were still weak and he was unable to move, walk, or transfer independently, but declined to change any of his gout medications until his current condition had improved. *Id.* at 1483.

Petitioner saw Dr. Hashem on March 9, 2018, to discuss further treatment for his GBS. Dr. Hashem noted that his clinical picture and EMG studies were consistent with GBS, specifically the AIDP variant of GBS, and indicated that additional treatment such as another course of IVIG would not improve his outcome. *Id.* at 1439. Petitioner had his tracheostomy tube removed on March 19, 2018.

On April 27, 2018, Petitioner had a neurological consultation with Dr. Kyle Blackburn to discuss treatment options given that Petitioner had not returned to his baseline levels. Dr. Blackburn noted that Petitioner continued to improve and that although he was still in a wheelchair, he was able to use a walker for short periods of time although Petitioner still experienced burning and swelling in his feet. *Id.* at 463. He also suggested an increase to Petitioner's gabapentin prescription for neuropathic pain and compression socks for swelling. *Id.*

By May 30, 2018, Petitioner's recovery was noted to be going well, with Petitioner now being able to walk "community distances" with a rolling walker and that he was functionally able to perform all of his own ADLs. *Id.* at 148. Petitioner was referred for outpatient PT and again was recommended to increase his dosage of gabapentin. *Id.*

On June 6, 2018, Petitioner was discharged home at his own request after learning that his pension benefits would be reduced if he required further inpatient care. Ex. 3 at 70-76. At the time of discharge, it was noted that Petitioner was walking independently with the use of a cane. All of Petitioner's further medical records relate to routine care of his other medical conditions and do not mention GBS sequelae with the exception of a telephonic appointment with Dr. Swati Lederer, a nephrologist, on October 1, 2019, in which Petitioner complained of shortness of breath with exertion and intermittent dizziness when standing. Ex. 3 at 2841. Dr. Lederer mentioned orthostasis or possible sequelae of GBS as possible causes. *Id.*

Petitioner has also submitted two statements which were signed under penalty of perjury. The first statement is from Petitioner himself, dated August 1, 2022. Ex. 1. Petitioner states that "a few days after the shot I did not feel well", that this continued on and within a few weeks, he was feeling pain in his lower back and legs. *Id.* at 1. He further notes that he became ill with a fever while staying with a friend over Christmas, and that thereafter he "drove home to east Texas and got a little better but not feeling well during this time." *Id.* He goes on to describe his initial fall at a convenience store, as well as falling in the parking lot of the VA on his way to an appointment for his respiratory illness.

The second statement is from Petitioner's friend, Jerry Edelman, with whom Petitioner stayed with for several days around Christmas of 2017. Ex. 5. Mr. Edelman

6

notes that Petitioner started having issues in "early December," that he told Petitioner he needed to go to the VA, and that he was concerned Petitioner's coughing was contagious and that he might have to leave the house. *Id.* at 1. He further states that he noticed weakness, including trouble standing and walking, recalling Petitioner's inability to help him put up a fence and staying seated during a trip to a local casino. *Id.* at 1-2. He also noted that Petitioner was unable to do "anything" on Christmas due to his ongoing illness. *Id.* at 2.

### III.     Legal Standard

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria (*i.e.* a Table injury), in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. If a petitioner establishes a Table injury the burden shifts to respondent to establish a more likely alternative cause. Section 13(a)(1)(A),

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

7

11(c)(1)(C)(i), 14(a). If a petitioner cannot establish a Table injury, he or she may pursue causation-in-fact under the legal standard set forth in *Althen v. Sec'y of Health & Human Servs.*, 418 F. 3d 1274, 1278 (Fed. Cir. 2005).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, GBS is compensable if it manifests within 3-42 days (not less than three days and not more than 42 days) of the administration of an influenza vaccination. 42 C.F.R. § 100.3(a)(XIV)(D). (Further criteria for establishing a GBS Table Injury case be found under the accompanying qualifications and aids to interpretation. 42 C.F.R. § 100.3(c)(15)).

Cases alleging a Table GBS injury have often been dismissed for failure to establish proper onset. *See, e.g.*, *Randolph v. Sec'y of Health & Human Servs.*, No. 18-1231V, 2020 WL 542735, at *8 (Fed. Cl. Spec. Mstr. Jan. 2, 2020) (finding GBS onset at the earliest occurred 76 days post-vaccination, "well outside the 3-42-day window set by the Table for a flu-GBS claim"); *Upton v. Sec'y of Health & Human Servs.*, No. 18-1783V, 2020 WL 6146058, at *2-3 (Fed. Cl. Spec. Mstr. Sept. 24, 2020) (finding the petitioner did not establish the onset of her GBS within the 3-42 day time frame prescribed and thus did not establish a Table Injury). But even non-table claims have been dismissed when onset occurs significantly outside the 42-day limit. *See, e.g.*, *Chinea v. Sec'y of Health & Human Servs.*, No. 15-095V, 2019 WL 1873322, at *33 (Fed. Cl. Mar. 15, 2019), *review denied*, 144 Fed. Cl. 378 (2019) (finding that the onset of the petitioner's GBS occurred eleven to twelve weeks after her vaccination, which was beyond the six- to eight-week medically appropriate timeframe for the occurrence of vaccine-induced GBS); *Barone v. Sec'y of Health & Human Servs.*, No. 11-707V, 2014 WL 6834557, at *13 (Fed. Cl. Spec. Mstr. Nov. 12, 2014) (finding eight weeks (56 days) is the longest reasonable timeframe for a flu vaccine/GBS injury).

## Analysis

Petitioner asserts that he is entitled to compensation because he has established a Table injury. Mot. at 26-28. Specifically, Petitioner submits that the onset of his GBS first manifested "within a few days" of receiving the flu vaccine, citing Petitioner's statement that he started to not feel well a few days after the vaccination, and that within a "few weeks" he started to get sick and feel pain in his lower back and legs. Mot. at 29. Petitioner also points to his report of chronic eye pain on December 13, 2017, arguing that his complaint of "continued dizziness" establishes GBS's manifestation by December

19, 2017. Petitioner finally contends that he was complaining of back pain "as early as mid-December," and that "other symptoms were present prior to that." *Id.*at 30-31. Alternatively, Petitioner argues he has met his burden in proving a cause-in-fact claim because *Althen* Prong 1 is satisfied by the established science involving GBS caused by the influenza vaccination; *Althen* Prong 2 is satisfied because Petitioner has shown he did not have issues with GBS prior to vaccination and that after vaccination he was affirmatively diagnosed with GBS; and that *Althen* Prong 3 is satisfied because of the symptoms described in Petitioner's statement as well has his eye issues and "other symptoms." *Id.* at 35.

Respondent maintains in response that Petitioner has not met the Table requirements because the onset of his GBS occurred no sooner than January 5, 2018, when Petitioner indicated he first fell due to weakness in his lower extremities - 65 days (or more than nine weeks) after his November 1, 2017, vaccination. Resp. at 11. Respondent also contends that there is evidence that Petitioner's GBS was caused by factors unrelated to the administration of the vaccine, specifically a preceding upper respiratory infection. *Id.* at 12. And Petitioner has not established causation-in-fact because he has failed to offer a reputable medical theory that the flu vaccine can cause GBS over 60 days after administration, and that the flu vaccination was more likely the cause of his GBS as opposed to his URI. *Id.* at 13-14.

## I. Petitioner Has Not Established a Table Claim

The following factual findings are made after a complete and thorough review of the record, including all medical records, affidavits, and all other additional evidence and filings from the parties.[4]

Petitioner alleges he suffered a Table GBS injury following a flu vaccine administered on November 1, 2017. Mot. at 28-31. To meet the onset requirement, Petitioner would need to show his symptoms began within three to 42 days of his vaccination, or no later than December 13, 2017. But credible contemporaneous medical records preponderantly establish that the initial symptoms of Petitioner's GBS did not occur until approximately 65 days after his vaccination, on January 5, 2018, when Petitioner first indicated he fell due to lower extremity weakness.

Petitioner has attempted to fit his symptoms into the Table timeframe by relying almost exclusively on two sworn statements - one by Petitioner himself and one by his

---

[4] Though every document is not specifically referenced in this ruling, the complete record was reviewed and considered. *See Moriarty ex rel. Moriarty v. Sec'y of Health & Human Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision.").

friend, with whom it was alleged Petitioner stayed with for portions of December 2017. Petitioner places great weight on his statement that "[w]ithin a few days after the shot I did not feel well." Ex 5 at 1. But this statement is far too vague to provide the necessary support for Petitioner's claim. There is a lower boundary on flu-GBS symptoms of three days, which Petitioner's assertion could fail to meet if the onset was too early, and it is unclear what Petitioner means by a "few" days. It is also unclear what the actual symptoms were, as "not feeling well" could consist of any multitude of potential symptoms (many of which would not constitute onset of neurologic symptoms – even if they reflected the kind of vaccination-related malaise individuals often experience). Six days after receiving the vaccination in question, Petitioner saw Dr. Shwin concerning his gout, but did not mention anything in association to the vaccination he had recently received.

The sworn statement of Petitioner's friend, Mr. Jerry Edelman, is similarly vague. Mr. Edelman says that Petitioner stayed at his house "quite a bit in December 2017, and in January 2018 too" but is unable to provide specific dates, or even a range of potential dates. Ex. 5 at 1. He notes that he "started to notice issues in early December of 2017" which he goes on to describe as "weakness" with "trouble standing and trouble walking." *Id.* He also goes on to mention that at that time Petitioner was "coughing and sweating" a lot, to the point where Mr. Edelman requested that Petitioner leave his house out of concern of contagiousness. *Id.* And he mentions that he spent Christmas with Petitioner but that he could not do anything that day, and that they took a trip to Missouri during which Petitioner was still coughing. *Id.* at 2. This account roughly lines up with the medical records, which show that on December 30, 2017, Petitioner contacted the VA clinic with complaint of a productive cough for the past five days, which would place the start of that cough on or about December 25, 2017. But this is still almost two weeks *after* the 42-day timeframe window for manifestation of GBS symptoms would have closed – and respiratory symptoms do not reflect the kind of neurologic concerns that would stand as GBS's onset.

The only other medical visit Petitioner had within the Table timeframe occurred on December 13, 2017 (exactly 42-days post-vaccination), when he requested a referral to an ophthalmologist for "chronic eye pain." Ex. 3 at 2162. That appointment took place on December 21, 2017, but the records noted that Petitioner had been dealing with "stringy mucous discharge" since the 1970s – a preexisting condition as opposed to something new. *Id.* at 2151. Further, Petitioner himself related his symptoms to conjunctivitis, because in 2014 he was prescribed amoxicillin for a UTI and that caused him to experience relief of his eye symptoms.

Petitioner also attempts to fit in his reported symptoms at medical appoints later than December 13, 2017, as evidence of manifesting GBS in the six-week post-

vaccination timeframe. For example, Petitioner contends that the dizziness when standing up he complained of at his December 19, 2017, audiology consultation shows he was "suffering from symptoms well before the onset date asserted by Respondent" because he was ultimately assessed with autonomic dysfunction. Reply at 3. Petitioner further associates his lower back and leg pain, reported to have started ten days before his December 20, 2017 appointment (e.g., on December 10, 2017) as further evidence of the manifestation of his GBS.

These contentions are unpersuasive. Although the Reply argues that "this record does not mention a fall or a trauma in the shower to explain his symptoms, just leaning over" (*Id.* at 4), the records indicate that Petitioner believed that bending over in the shower was the particular mechanism which initiated that bout of pain, and the treating physician Dr. Bitussi assessed it as a "sprain/strain" with an "inciting even [sic] that occurred 10 days ago." Ex. 3 at 2156. Petitioner's prior medical history is also significant for back pain. Indeed, the reason for the medical visit at which Petitioner received the vaccination at issue was for shoulder pain, back pain, and vitamin B deficiency. *Id.* at 2180. His history of back pain was significant enough that an MRI was performed on his back in 2016, which was reviewed by Dr. Bitussi at the December 20, 2017, appointment.

When the record is read in its entirety, the evidence of a purportedly-earlier onset is thin, when compared to evidence of an onset in early January. Moreover, even if I gave Petitioner's assertions about an earlier onset more weight, they would describe a GBS course wholly inconsistent with what is known about the illness. In the vast majority of cases, GBS (when manifesting as the AIDP variant at issue herein) is an acute and monophasic condition. It is not known to present with bouts of eye or audiological issues prior to neurological symptoms, and which subsequently remain subacute for weeks or months. *Chinea*, 2019 WL 1873322, at *31, 33. It is not preponderantly likely that Petitioner would have experienced GBS onset in the form he described in December, only to manifest acutely at the beginning of January – with all of these symptomatic events occurring a fairly long time after the purported instigating event of vaccination.

Thus, a preponderance of evidence best supports the conclusion that the onset of Petitioner's GBS occurred 65 days after his flu vaccination. This is well outside the 42-day window set forth in the Table, and therefore Petitioner has not met the criterion needed to establish a Table claim.

**II.    Petitioner Has Not Established a Causation-In-Fact Claim**

To proceed on a theory of causation-in-fact, a petitioner must show by a preponderance of the evidence that "a vaccination brought about her injury by providing:

(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278. All three prongs must be met. *Id.* (providing a petitioner must satisfy all three prongs).

The record preponderantly establishes that Petitioner's GBS began no sooner than 65 days post vaccination, outside the *longest timeframe* (eight weeks) generally accepted for a similar non-Table claim recognized in the Program. *See, e.g.*, *Barone*, 2014 WL 6834557, at *13. Such a delay in manifestation of his symptoms is too lengthy to be considered "medically acceptable to infer causation-in-fact." *See de Bazan v. Sec'y of Health & Human Servs. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). (Indeed, it is arguably the case that *any* onsets that exceed the 3-42 day timeframe are suspect from a medical/scientific standpoint, even if some special masters have been willing to deem up to an eight-week timeframe medically acceptable).

Here, a nine-week onset (coupled with symptoms that have not convincingly been demonstrated to be GBS-specific) is simply too remote from the date of vaccination to reasonably associate the two. To find otherwise would be to embrace a *post hoc ergo propter hoc* kind of reasoning not accepted for causation cases. *Bulman v. Sec'y of Health & Hum. Servs.*, No. 19-1217V, 2023 WL 5844348, at *14 (Fed. Cl. Aug. 16, 2023) ("Program case law recognizes that not all post-vaccination injuries are vaccine-caused simply because vaccination predated them."); *see also Galindo v. Sec'y of Health & Hum. Servs*, No. 16-203V, 2019 WL 2419552, at *20 (Fed. Cl. Spec. Mstr. May 14, 2019) (citing *U.S. Steel Group v. United States*, 96 F. 3d 1352, 1358 (Fed Cir. 1996) ("[b]ut to claim that the temporal link between these events proves that they are casually related is simply to repeat the ancient fallacy: *post hoc ergo propter hoc*"). Petitioner has not otherwise persuasively established circumstances in which such an unusually lengthy post-vaccination onset could still be deemed medically acceptable – especially since Petitioner's earlier symptoms are either unrelated to his GBS, or reflect pre-vaccination conditions.

## Conclusion

The evidentiary record does not preponderantly support Petitioner's contention that the flu vaccine he received in November 2017 caused his GBS in the timeframe at issue, does not support the allegation that he suffered a Table Claim, and would not support allegations that his GBS was caused-in-fact by the flu vaccine.

Petitioner has not established entitlement to a damages award, and therefore I

must **DISMISS** his claim in its entirety. **The Clerk of Court shall enter judgment accordingly.**[5]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[5] If Petitioner wishes to bring a civil action, he must file a notice of election rejecting the judgment pursuant to § 21(a) "not later than 90 days after the date of the court's final judgment."