# In the United States Court of Federal Claims

BUDDY KINDLE,

               Petitioner,

           v.

SECRETARY OF HEALTH AND HUMAN
SERVICES,

             Respondent.

No. 20-1423

Filed Under Seal: July 17, 2025[1]

Publication Date: August 7, 2025

*Courtney Jorgenson* of Siri & Glimstad LLP, Phoenix, AZ, for Petitioner.

*Camille M. Collett* of the United States Department of Justice, Civil Division, Torts Branch, Washington, D.C. for Respondent. With her on the briefs were *Yaakov M. Roth*, Acting Assistant Attorney General, United States Department of Justice; *C. Salvatore D'Alessio*, Director, United States Department of Justice, Civil Division, Torts Branch; and *Heather L. Pearlman*, Deputy Director, United States Department of Justice, Civil Division, Torts Branch.

## MEMORANDUM AND ORDER

Petitioner Buddy Kindle seeks review of a decision dismissing his petition for compensation under the National Vaccine Injury Compensation Program (Vaccine Act). 42 U.S.C. §§ 300aa-10 *et seq.* Petitioner filed a petition for compensation alleging that he suffered from Guillain-Barré Syndrome (GBS) caused by the influenza vaccine he received on November 1, 2017. On January 21, 2025, the Chief Special Master dismissed Petitioner's claim. Pending

---

[1] On July 17, 2025, this Court issued a sealed version of this Memorandum and Order. ECF No. 39. On August 5, 2025, the parties filed a Joint Status Report indicating that they had no proposed redactions to the Memorandum and Order. ECF No. 41. The sealed and public versions of this Memorandum and Order are identical, except for this footnote, the addition of the publication date, and corrections to minor typographical or citation errors.

before the Court is Petitioner's Motion for Review of the Chief Special Master's Decision dismissing his petition for compensation.

This case involves circumstances that evoke sympathy from the Court. Petitioner's illness has caused him significant hardship, pain, and suffering. The difficulties associated with his circumstances are not lost on this Court. Despite this, the Court is bound by the law and must apply the Vaccine Act as written—even when doing so might lead to a disappointing result for those involved. For the reasons explained below, Petitioner's arguments do not provide a sufficient basis for setting aside the Chief Special Master's Decision. Accordingly, Petitioner's Motion for Review is **DENIED**.

## BACKGROUND

### I.    Factual Background

The Chief Special Master's Decision contains a thorough discussion of the evidence of record. ECF No. 37 (Decision) at 2−7.[2] What follows is a summary of the aspects of the record pertinent to issues raised in Petitioner's Motion for Review.

#### A.    Petitioner's Medical History

On November 1, 2017, Petitioner saw his Primary Care Physician (PCP), Dr. Keith Wixtrom, for management of constipation, shoulder pain, back pain, and a vitamin B-12 deficiency. Pet. Ex. 3 at 2180. During that visit, Petitioner was administered the influenza vaccine in his left deltoid. *Id.* at 2174−75. At this time, Petitioner was 72 years old and had a history of numerous medical issues, including kidney disease, vertigo, sleep apnea, gout, and

---

[2] For clarity and consistency with other filings in this case, citations to Petitioner's medical records reference the pagination assigned by Petitioner, noted at the bottom right corner of each page. *See* Pet. Ex. 2 (ECF No. 6-2); Pet. Ex. 3, Part 1 (ECF No. 6-3); Pet. Ex. 3, part 2 (ECF No. 6-4); Pet. Ex. 4 (ECF No. 20-1). Otherwise, citations throughout this Memorandum and Order reference the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

hypothyroidism.  *Id.* at 2178–79 (medical history recorded on date of vaccination); *see also id.* at 1054−55 (noting significant medical issues).

### 1.    Within 3–42 Days of Vaccination

Six days after his vaccination, on November 7, 2017, Petitioner saw a rheumatologist for management of his gout, with which he was diagnosed in 2010.  *Id.* at 2169−73.  During the visit, Petitioner complained of a gout attack on October 17, 2017, which had resolved spontaneously; pain in his left rotator cuff; and an inability to jog or run.  *Id.* at 2169.  Petitioner noted that he "probably . . . was not exercising enough" and that he had recently withdrawn from a gout study.  *Id.*  Petitioner's physical exam revealed "no gross focal [neurological] deficits," and the rheumatologist listed "gout, knee osteoarthritis, and rotator cuff tend[i]nopathy" on Petitioner's "[p]roblem list."  *Id.* at 2171, 2173.

On December 13, 2017—42 days post-vaccination—Petitioner requested an ophthalmology consultation at the United States Department of Veterans Affairs' Dallas Medical Center (Dallas VA), for chronic eye pain and discharge.  *Id.* at 2159−62.  Petitioner relayed that he had previously been referred to a different medical clinic for this problem and requested a refill of eye drops.  *Id.* at 2162.

### 2.    More Than 42 Days After Vaccination

On December 19, 2017, Petitioner had an audiological evaluation in which he reported "positive history of aural pain and pressure, frequent sinus/cold issues, and bilateral tinnitus" and "continued dizziness when standing/standing up to walk."  *Id.* at 2158−59.  The audiologist noted that Petitioner "ha[d] limited to no concerns regarding changes in hearing since [his] last evaluation" and "denie[d] aural infection/surgery or other major medical changes since his last evaluation in May 2013."  *Id.* at 2158.  Petitioner reported "[n]o other significant problems or concerns" at the time of the appointment.  *Id.*

On December 20, 2017, Petitioner had a Physical Medicine Rehabilitation consultation for "chronic lower back pain with an inciting even[t] that occurred 10 days ago." *Id.* at 2153−58. Specifically, Petitioner "leaned over in [the] shower and got pain accross [sic] his whole lower back," but he "didn't feel any big issues after this." *Id.* Petitioner's PCP had referred him to this appointment, specifically for a spine consultation and recommendations. *Id.* at 2153. The notes from this appointment reflect that the onset of Petitioner's injury occurred in 1966; when Petitioner was in the Marine Corps, "he jumped from 35 ft up" and "[a]t that time he felt a dullness in his back." *Id.* ("ONSET: first event 1966."). Petitioner described the pain as "constant," "sharp stabbing," and "across the whole back and now going down the left side of the leg to just above the knee on the posterior side." *Id.* The work up from the visit noted Petitioner's "[m]ultilevel disc degenerative changes with small disc protrusions . . . but no signs of spinal stenosis" and "large renal cysts . . . consistent with known polycystic kidney disease." *Id.* at 2153−54; *see also id.* at 2158 (attributing Petitioner's back pain to "DDD" and "recent onset of lumbar sprain/strain"); Pet. Ex. 4 at 198 (records from a June 2021 appointment noting "[h]istory of lumbar degenerative disc disease on MRI in 2016").[3] The records also state that Petitioner's back pain was "most likely due to a sprain/strain," and Petitioner was referred to physical therapy. Pet. Ex. 3 at 2156, 2158.

On December 21, 2017, Petitioner attended his requested ophthalmology consultation. *Id.* at 2151−52, 2159−62. Records from that appointment reflect that Petitioner complained of "stringy mucous discharge [in both eyes] since [the] 1970s," and that Petitioner "still note[d] heavy swollen lids," notwithstanding daily treatment. *Id.* at 2151. Further, the records note "[t]ransient

---

[3] Based on these records, the Court interprets "DDD" as shorthand for "degenerative disc disease."

(sev minutes) horiz diplopia resolved completely by unilat occlusion, yesterday, first episode";
"[o]cular motility: orthotropia with full ductions and versions OU"; and "acute transient
diplopia."[4]  *Id.* at 2151−52.  Additionally, the Assessment portion of the records from that visit
notes meibomian gland dysfunction and "fixat[ion] on possible 'infected tear gland,'" and a prior
bout of what Petitioner seemed to believe was conjunctivitis.[5]  *Id.* at 2152.  The Assessment also
suggested that "HT"—hypertension—was the suspected "underlying etiology" for the "acute
transient diplopia."  *Id.*

On December 30, 2017, Petitioner called the Dallas VA call center, complaining of a cough
which he reported had begun five days prior.  *Id.* at 2148–49.  Petitioner denied having pain,
"feeling feverish," or having trouble breathing at the time of the appointment.  *Id.*  at 2149–50.
The nurse with whom Petitioner spoke suggested that he follow up with the emergency department

---

[4] "Diplopia" is "double vision caused by defective function of the extraocular muscles or a disorder
of the nerves that innervate the muscles."  *Diplopia*, *Mosby's Medical Dictionary* (10th ed. 2017).
"Occlusion" refers to "the state of being closed."  *Occlusion*, *Mosby's Medical Dictionary* (10th
ed. 2017).  Thus, "[t]ransient (sev minutes) horiz diplopia resolved completely by unilat occlusion"
refers to temporary double vision lasting for several minutes, in which the two images appear side-
by-side, which goes away when one eye is closed or covered.  Further, "acute transient diplopia"
means sudden temporary double vision.  "Motility" is "spontaneous but unconscious or
involuntary movement," but also refers generally to the "condition of being capable of movement."
*Motility*, *Mosby's Medical Dictionary* (10th ed. 2017).  "Ocular motility" specifically refers to the
movement of the eyes.  "Orthotropia" refers to normal eye alignment, in which the eyes are looking
straight ahead.  "Duction" means "the movement of an individual eyeball from the primary to
secondary or tertiary position of gaze."  *Duction*, *Mosby's Medical Dictionary* (10th ed. 2017).
"Versions" are how the eyes move together, and "OU" (meaning *oculus uterque*) means both eyes.

[5] The "Assessment" portion of the medical records, which is included in the notes of several of
Petitioner's appointments between 2015 and 2022, appears to include historical notes regarding
Petitioner's history with various eye conditions, which his doctors supplemented over time.  *See*
Pet. Ex. 3 at 1267−68 (December 10, 2015 appointment), 2151−52 (December 21, 2017
appointment), 2494−96 (February 19, 2020 appointment), 2868−70 (August 19, 2019
appointment); Pet. Ex. 4 at 314−16 (June 3, 2022 appointment), 555−57 (June 24, 2021
appointment), 1397−400 (December 10, 2020 appointment).

within two to eight hours, but Petitioner did "not wish to seek care at ER without pre-authorization of VA payment." *Id.* at 2148.

On January 2, 2018, Petitioner had an appointment with his PCP, Dr. Keith Wixtrom, reporting a "productive cough" which had been ongoing for 10 days, along with chest pain and shortness of breath. *Id.* at 2141–47. The nurse noted that Petitioner was "well oriented," ambulating well, and presenting stable vital signs. *Id.* at 2147. Though his appetite was diminished, Petitioner was tolerating food and fluids well. *Id.* Petitioner was prescribed an albuterol inhaler, antibiotics, and cough medication. *Id.* at 2143–44.

On January 7, 2018, Petitioner again called the Dallas VA call center, this time complaining that his face had been numb on both sides since the previous day. *Id.* at 2139–40. Petitioner stated that on the day he called, his feet began feeling numb, he felt weak, and he collapsed in a store. *Id.* at 2140. Petitioner noted that he had not been taking his thyroid medication as directed and considered whether he may be having a problem with his thyroid. *Id.* He denied chest pain or difficulty breathing. *Id.* The nurse instructed him to seek medical care immediately. *Id.*

When Petitioner arrived at the Dallas VA Emergency Department later that day, his legs "gave way" as he was getting out of his vehicle, causing him to collapse in the parking lot. *Id.* at 2130–31. Although Petitioner was unable to get up, a fellow veteran found him lying on the ground and helped him inside. *Id.* at 2131. Petitioner reported "freuqent [sic] recent falls"— specifically more than five falls in the previous two days—due to both legs "giv[ing] out" and numbness in his feet and hands. *Id.* Petitioner again noted that he had not been taking his thyroid medication; specifically, he reported that he had "been off his levothyroxine for the past 2-3 weeks and [was] not always[s] compliant." *Id.* Petitioner denied any visual changes, shortness of breath, or passing out, and noted no difficulty with swallowing or speech. *Id.*

The next day, on January 8, 2018, Petitioner reported more than six falls, that "his legs fe[lt] sleepy and his face fe[lt] numb," and fever and chills. *Id.* at 2118–19. His treating physician confirmed that he had a low-grade fever. *Id.* at 2125. Petitioner's doctor also ordered labs and referred Petitioner to a physical and occupational therapy to determine whether his falls were related to noncompliance with his thyroid medication. *Id.* at 2124–25.

Two days later, on January 10, 2018, while still at the Dallas VA, a neurologist, Dr. Meredith Bryarly, described Petitioner's symptoms as "most concerning for GBS." *Id.* at 2042–48. Dr. Bryarly noted "[p]rogressive weakness, sensory loss, dyspnea, loss of reflexes," and significant diaphragmatic weakness. *Id.* at 2048. She also suggested that Petitioner's respiratory illness may have been the inciting factor. *Id.* There was also concern that Petitioner's "weakness may quickly progress to involve his respiratory muscles and he is at risk of developing acute respiratory failure." *Id.* at 2047. Petitioner was admitted to the Critical Care Unit that day. *Id.* at 2020, 2023.

On January 11, 2018, Petitioner experienced "significant changes." *Id.* at 2020–22. Petitioner complained of a pain located between his eyes, and the left side of his face had less sensation than the right. *Id.* at 2020. Petitioner also said that his left foot felt much warmer than his right foot, but on examination, the right foot felt warmer. *Id.* at 2020–21. Petitioner stated that he "believes his weakness and sensation loss is ascending and he is having more difficulty breathing." *Id.* at 2021. Dr. Bryarly and the medical student working with her noted that Petitioner's "physical exam findings and history of an [Upper Respiratory Infection (URI)] in December 2017, still fit with a GBS etiology." *Id.* at 2022.

Also on January 11, 2018, Dr. Bryarly analyzed Petitioner's SNC Comparison, Motor Nerve Conduction, F-Wave, and Electromyography (EMG) studies, concluding that the findings

were "consistent with the clinical diagnosis of GBS." *Id.* at 2307–08. The next day, a physician resident noted that the studies "revealed absent F-waves, as would be typically seen in the early phase of GBS." *Id.* at 2011; *see also id.* at 1986 (noting the same on January 16, 2018). Petitioner was intubated that day. *Id.* at 1917, 2014–15.[6]

Petitioner started Intravenous Immunoglobin (IVIG) three days later, on January 14, 2018. *Id.* at 1989−91. Two days later, Petitioner had a follow up with a medical resident, Dr. Farukh Ikram, and a neurologist, Dr. Paul Hurd. *Id.* at 1984–87. They concluded that Petitioner's "progressive weakness, sensory loss, dyspnea, [and] loss of reflexes" were "most concerning for GBS/AIDP."[7] *Id.* at 1986. Petitioner received his fifth and final dose of IVIG on January 18, 2018. *Id.* at 1968.

On January 26, 2018, Petitioner began to show signs of improvement. *Id.* at 1905–08 (noting that Petitioner likely had the AIDP variant of GBS given the absent F-waves on his EMG study). Petitioner's condition continued to improve throughout February. *Id.* at 1852; *id.* at 1814–15 (noting "daily neurologic improvement" but also difficulty breathing on February 9, 2018); *id.* at 1620–22. On March 1, 2018, Petitioner was discharged to an inpatient rehabilitation center, or "community living center," at the Dallas VA. *Id.* at 1572–82, 1596−99.

On March 6, 2018, during an appointment for gout management, Petitioner noted that he was still experiencing weakness in his legs and hands and was unable to walk, but he could swallow

---

[6] Although Petitioner's medical records note that he was intubated on "11/11," that appears to be a typographical error. *See, e.g.*, Pet. Ex. 3 at 2014–15. Other records note that he was intubated on January 11, 2018, which aligns with the timing of Petitioner's stint in the Dallas VA and the events at issue. *Id.* at 1917; *see also* Decision at 4 (citing Pet. Ex. 3 at 2015).

[7] AIDP is a variant of GBS. 42 C.F.R. § 100.3(c)(15)(ii) ("The most common subtype [of GBS] in North America and Europe, comprising more than 90 percent of cases, is acute inflammatory demyelinating polyneuropathy (AIDP).").

and talk and his breathing was improving. *Id.* at 1482 (noting Petitioner's "respiratory illness was thought to be the inciting factor" of his GBS).

Petitioner had another neurology consultation on March 9, 2018—according to Petitioner's treating neurologist, this was "roughly 8 weeks from the initial illness."[8] *Id.* at 1435–40. Petitioner requested the appointment to discuss treatment for his GBS, as he continued to have lower extremity weakness and some numbness in his feet and hands. *Id.* at 1436. Petitioner did show signs of improvement, however, and Petitioner said that he was "doing much better." *Id.* Petitioner's neurologist noted that his "significantly improved strength," suggested that it was unlikely that he had Chronic Inflammatory Demyelinating Polyneuropathy (CIDP)—the chronic form of GBS. *Id.* at 1439. The neurologist also noted that Petitioner's illness was consistent with the AIDP variant of GBS, which the doctor described as a "monophosic [sic] illness." *Id.*; *see also id.* at 153 ("We again discussed that AIDP is a monophasic illness and that his active disease occurred in January . . . .").

Throughout April and May 2018, Petitioner continued to show signs of improvement. *Id.* at 463 (noting that on April 27, 2018, "Mr. Kindle appear[ed] to have made significant strides in his recovery from what seem[ed] to be GBS"); *id.* at 154–55 (physical therapist noting on May 30, 2018, that "in [her] professional opinion, [Petitioner] has made great srides [sic] in his recovery"). In June, Petitioner was discharged to his home at his own request. *Id.* at 70–85.

In contrast to his contemporaneous medical records from 2018, which suggest that Petitioner's GBS may have been caused by his upper respiratory infection, some of Petitioner's subsequent medical records from 2021—after the inception of this case—contain notes reflecting

---

[8] This statement was made by the neurology resident, Dr. Jafar Hashem, who treated Petitioner along with Dr. Bryarly when Petitioner was initially admitted to the Emergency Department of the Dallas VA. *See* Pet. Ex. 3 at 1435–36; Decision at 4, 6.

Petitioner's view that his GBS may have stemmed from his flu vaccination or observing that Petitioner's GBS occurred after his flu vaccine. *Compare id.* at 1482 (rheumatologist noting on March 6, 2018, that Petitioner had GBS and his "respiratory illness was thought to be the inciting factor"), *and id.* at 1962 ("Subsequent workup consistent with Guillain Barre after possible bronchitis . . . ."), *and id.* at 2048 (Dr. Bryarly, noting on January 10, 2018, that Petitioner's "respiratory illness may have been the inciting factor" for his GBS), *with* Pet. Ex. 4 at 1392 (PCP noting "[s]evere life-threatening reaction to a prior dose of influenza vaccine[,] [c]omment: Guilla[i]n-Barre syndrome" on January 27, 2021), *and id.* at 1018 (noting on February 3, 2021 that Petitioner was "very reluctan[t] to have the flu vaccine" as he "received the flu vaccine in 2018[9] and shortly afterward had a severe Guillain-Barre reaction").

## B.    Affidavits

In support of his Petition, Petitioner filed two affidavits—his own statement and another from a friend, Mr. Jerry Edelman.  Pet. Ex. 1 (ECF No. 1-2) (Kindle Aff.); Pet. Ex. 5 (ECF No. 22-1) (Edelman Aff.).

### 1.    Statement of Petitioner Buddy Kindle

According to Petitioner's affidavit, "[w]ithin a few days" of receiving the flu vaccine on November 1, 2017, he "did not feel well."  Kindle Aff. ¶¶ 2, 5.  "This continued on and within a few weeks [he] was feeling pain in [his] lower back and pain in [his] legs."  *Id.* ¶ 5.  When he "didn't feel well" over Christmas and developed a fever, his friend suggested that Petitioner go to the hospital.  *Id.* ¶ 7.  Instead, Petitioner drove home to east Texas.  *Id.*  During this time, Petitioner avers that he "got a little better but [was] not feeling well."  *Id.*

---

[9] It is undisputed that Petitioner received the influenza vaccine on November 1, 2017—not in 2018 as this record suggests.  Pet. Ex. 3 at 2174−75; MFR Mem. at 15; Resp. at 6.

On January 8, 2018, Petitioner's "legs completely gave way," and he collapsed at the counter of a convenience store. *Id.* ¶ 8. The store clerk helped Petitioner get up and to his car. *Id.* When Petitioner called the Dallas VA, he was instructed to immediately come to the Emergency Room there. *Id.* ¶ 9. Petitioner drove home first to change his clothes; between his car and front door he fell five times, but was able to get back in his car and drive to the Dallas VA. *Id.* When Petitioner arrived at the Dallas VA and got out of his car, he collapsed again. *Id.* ¶ 10. A Marine veteran helped Petitioner into the emergency room in a wheelchair. *Id.* Petitioner was ultimately diagnosed with GBS during his stay in the Dallas VA. *Id.*

Following his diagnosis, Petitioner spent two months in the Intensive Care Unit (ICU). *Id.* ¶ 11. He was "on a respirator and being fed through a tube" during that time. *Id.* Since then, Petitioner states that he has numerous medical problems he had "never had" prior to his GBS diagnosis: his "feet and lower legs hurt and are swollen," he has "severe cramps," getting up after sitting for a period of time "is difficult and painful," he can only walk for a few hundred feet before experiencing pain, he has shortness of breath, and is incontinent. *Id.* Beyond those symptoms, he is "no longer able to walk in the woods"; "trips and falls frequently"; can no longer play tennis, golf, or any other sports; can no longer swim; has gained weight; and has difficulty with basic tasks such as getting dressed and tying his shoes. *Id.* ¶ 12. He has no balance and is in constant pain. *Id.*

### 2.    Statement of Jerry Edelman

In his affidavit, Mr. Edelman states that he has known Petitioner for around ten to twelve years. Edelman Aff. ¶ 1. Petitioner stayed with Mr. Edelman in his home in Dallas often during December 2017 and January 2018, and therefore Mr. Edelman states that he "had a pretty good view of the changes that [Petitioner] went through." *Id.* ¶¶ 2–3. Mr. Edelman states that he started to notice Petitioner having issues in "early December of 2017." *Id.* ¶ 3. Specifically, Mr. Edelman

noticed Petitioner was coughing through the night, sweating, and going to the restroom constantly. *Id.* ¶¶ 5–6.  Further, Mr. Edelman noticed that Petitioner had weakness and trouble standing and walking, and that Petitioner's appetite was off.  *Id.* ¶¶ 6−8.  When Mr. Edelman and Petitioner took a trip to a casino, Petitioner brought a breathing machine and stayed seated during the entire trip. *Id.* ¶ 9.  According to Mr. Edelman, he and Petitioner spent Christmas together, and Petitioner "couldn't do anything that day." *Id.* ¶ 10.

### C.    Medical Literature

Petitioner filed three pieces of medical literature in support of his Petition: Yale Medicine, *Guillain-Barré Syndrome*, Pet. Ex. 6 (ECF No. 27-1) (Yale Medicine); Mayo Clinic, *Guillain-Barré Syndrome* (June 14, 2022), Pet. Ex. 7 (ECF No. 27-2) (Mayo Clinic); and Xianjun Ding et al., *Guillain-Barré Syndrome and Low Back Pain: Two Cases and a Literature Review*, 13 Open Med. 503 (2018), Pet. Ex. 8 (ECF No. 27-3) (Ding).

The Yale Medicine and Mayo Clinic articles explain that GBS causes muscle weakness, and other symptoms including difficulty breathing, difficulty controlling eye movement, abnormal heart rate, abnormal blood pressure, and muscle pain.  Yale Medicine at 1−2; Mayo Clinic at 2−3.  Regarding timing and duration of onset, the Yale Medicine article notes that "[s]ymptoms can rapidly worsen in severity over hours or days and early treatment can considerably shorten the course of the illness," "symptoms may progress over the course of one to four weeks before leveling off," and are most severe within four weeks of symptom onset.  Yale Medicine at 1, 2, 4.  Similarly, the Mayo Clinic article notes that symptoms of weakness and tingling can "quickly spread" and "worsen rapidly," and that "[p]eople with Guillain-Barre syndrome usually experience their most significant weakness within two weeks after symptoms begin."  Mayo Clinic at 1, 3, 4.  Further, "[t]he disorder usually appears days or weeks after a respiratory or digestive tract

infection." *Id.* at 4.  Both articles also note that it is rare, but possible, for a vaccination to trigger GBS.  Yale Medicine at 1; Mayo Clinic at 4, 5.

Petitioner's third article, Ding, describes two case studies of patients whose GBS initially manifested as low back pain rather than limb weakness.  *See generally* Ding.  The article posits that low back pain can be a symptom of GBS and is overlooked because "most attention is directed towards the progression of weakness."  *Id.* at 4.  This creates a "diagnostic challenge," which can "delay the diagnosis of GBS."  *Id.*

## II.    Procedural Background

On October 20, 2020, Petitioner filed a petition for compensation under the Vaccine Act, alleging that he developed GBS after receiving the influenza vaccine on November 1, 2017, and that (i) his symptoms first manifested within 42 days of the vaccine, supporting a Table claim, or, alternatively, (ii) his GBS was caused-in-fact by the flu vaccine.  ECF No. 1 at 1, ¶ 13.  The claim was assigned to the Special Processing Unit of the Office of Special Masters, which is "designed to expedite the processing of claims that historically . . . have been resolved without extensive litigation."  ECF No. 10 at 1.

On September 29, 2021, Respondent filed its Rule 4(c) Report with the Office of Special Masters, asserting that this case was not appropriate for compensation under the terms of the Vaccine Act.  ECF No. 17 (Rule 4(c) Report) at 1.  *First*, Respondent asserted that Petitioner could not prove a Table injury, as (i) the evidence placed the onset of Petitioner's GBS symptoms on or around 67 days after receipt of the flu vaccination, rather than within the 3–42-day timeframe required for a successful Table claim, and (ii) there was evidence that Petitioner's GBS was caused by factors unrelated to the vaccine—specifically Petitioner's prior upper respiratory infection.  *Second*, Respondent asserted that Petitioner failed to satisfy his burden of proof to support a causation-in-fact claim under *Althen v. Secretary of Health & Human Services*.  *Id.* at 11–14.

On January 9, 2023, after providing Petitioner additional time to "file any medical records, detailed affidavits, or any additional evidence indicating that onset of Petitioner's GBS was within the prescribed Table timeframe," the Chief Special Master issued an Order stating that after reviewing the records in this matter, "a hearing d[id] not appear to be necessary," and directing the Petitioner to file a Motion for a Ruling on the Record. Minute Order, dated May 5, 2022; ECF No. 24 at 2.

Subsequently, on March 10, 2023, Petitioner filed his Motion for Decision on the Record, arguing that he had successfully carried his burden to prove a Table claim and, alternatively, a causation-in-fact claim. ECF No. 25 at 28–35. Respondent, maintaining its position in its Rule 4(c) Report, countered that Petitioner had failed to prove both a Table and off-Table (causation-in-fact) claim. ECF No. 26 at 1. Petitioner filed a Reply in support of his Motion on May 23, 2023. ECF No. 28.

### A.    The Decision

On January 21, 2025, the Chief Special Master dismissed Petitioner's claim, concluding that Petitioner failed to prove both his Table and off-Table claims. Decision at 9–12.[10]

The Chief Special Master first addressed Petitioner's Table claim, concluding that the evidence "preponderantly establish[ed] that the initial symptoms of Petitioner's GBS did not occur until approximately 65 days after his vaccination." *Id.* at 9. The Chief Special Master reasoned

---

[10] The Chief Special Master issued the Decision on January 21, 2025. ECF No. 31. Pursuant to Rule 18(b) of Appendix B of the Rules of the Court of Federal Claims (Vaccine Rules), the Chief Special Master provided the parties 14 days to identify and move to redact medical or other information, "the disclosure of which would constitute an unwarranted invasion of privacy." *Id.* at 1 n.1; Vaccine Rule 18(b)(2). As neither party moved to redact any information, the Chief Special Master publicly reissued the Decision on February 24, 2025. ECF No. 37. For clarity and consistency, all references to the Chief Special Master's Decision are to the public version, docketed as ECF No. 37.

that Petitioner's onset argument relied "almost exclusively on two sworn statements," and addressed those sworn statements before addressing Petitioner's medical records. *Id.* at 9–11.

Regarding Petitioner's own affidavit, the Chief Special Master noted that "Petitioner place[d] great weight on his" own statement that "[w]ithin a few days after the shot [he] did not feel well." *Id.* at 10 (quoting Kindle Aff. ¶ 5). The Chief Special Master found that this statement was "far too vague to provide the necessary support for Petitioner's claim." *Id.* In the Chief Special Master's view, it was "unclear what Petitioner mean[t] by a 'few' days" and to what kinds of symptoms Petitioner referred. *Id.* The Chief Special Master noted that Petitioner's symptoms could have occurred too early (less than three days after vaccination), and the symptoms experienced within a few days of the vaccine may not have been neurologic symptoms. *Id.* The Chief Special Master supported this reasoning with evidence from Petitioner's medical records: in an appointment concerning Petitioner's gout, occurring six days after receiving the vaccine, Petitioner did not mention any symptoms in association to the vaccine and Petitioner's rheumatologist did not note any. *Id.*

Next, the Chief Special Master concluded that Mr. Edelman's statement was "similarly vague." *Id.* The Chief Special Master first noted that Mr. Edelman's statement did not provide specific dates that Petitioner stayed with him in December 2017 and January 2018. The Chief Special Master acknowledged Mr. Edelman's statement that "he 'started to noticed issues [with Petitioner] in early December of 2017,'" including weakness, trouble standing, trouble walking, coughing, and sweating. *Id.* (quoting Edelman Aff. ¶ 3). Further, the Chief Special Master noted that Mr. Edelman's statement that "he spent Christmas with Petitioner but that [Petitioner] could not do anything that day, and that they took a trip to Missouri during which Petitioner was still coughing," roughly lines up with Petitioner's medical records, which place the start of his cough

on December 25, 2017. *Id.* (citing Edelman Aff. ¶ 10). But the Chief Special Master observed that (i) this was almost two weeks after the Table timeframe had closed, and (ii) "respiratory symptoms do not reflect the kind of neurologic concerns that would stand as GBS's onset." *Id.*

The Chief Special Master then addressed Petitioner's medical records. He concluded that, aside from the previously mentioned gout appointment, "the only other medical visit Petitioner had within the Table timeframe occurred on December 13, 2017 (exactly 42 days post-vaccination), when he requested a referral to an ophthalmologist for 'chronic eye pain.'" *Id.* (quoting Pet. Ex. 3 at 2162). However, the Chief Special Master reasoned that records from the requested appointment (which took place on December 21, 2017) noted Petitioner's prior history with various eye conditions—including "stringy mucous discharge," which Petitioner had experienced since the 1970s. *Id.* (quoting Pet. Ex. 3 at 2151).

The Chief Special Master found Petitioner's reliance on medical records after the close of the Table timeframe on December 13, 2017 "unpersuasive." *Id.* at 10–11. This includes: (1) Petitioner's complaint of dizziness at his December 19, 2017 audiology appointment, and (2) Petitioner's lower back and leg pain noted at a December 20, 2017 appointment, reported to have begun on December 10, 2017. *Id.* at 11. With respect to Petitioner's lower back and leg pain, the Chief Special Master found that the records indicate that back pain was caused by bending over in the shower, noting that Petitioner's doctor assessed it as a "sprain/strain" with an inciting event occurring 10 days prior, and Petitioner's "prior medical history is significant for back pain." *Id.* (citing Pet. Ex. 3 at 2156).

Ultimately, the Chief Special Master concluded that the record "in its entirety" best supported the conclusion that Petitioner's GBS symptoms first occurred 65 days post-vaccination, and that Petitioner therefore had failed to prove a Table claim. *Id.* The Chief Special Master

reasoned that Petitioner's evidence of an earlier onset was thin in comparison to evidence supporting a January 2018 onset. *Id.* Further, Petitioner's theory "would describe a GBS course wholly inconsistent with what is known about the illness," as the AIDP variant of GBS is "acute and monophasic," and "is not known to present with bouts of eye or audiological issues prior to neurological symptoms, and which subsequently remain subacute for weeks or months." *Id.* (citing *Chinea v. Sec'y of Health & Hum. Servs.*, No. 15-095V, 2019 WL 1873322, at *31, 33 (Fed. Cl. Spec. Mstr. Mar. 15, 2019), *review denied*, 144 Fed. Cl. 378 (2019)).

Likewise, the Chief Special Master concluded that Petitioner had failed to prove his off-Table causation-in-fact claim. *Id.* at 11–12. The Chief Special Master's causation analysis focused primarily on the nine weeks between the vaccine and the onset of Petitioner's GBS symptoms—which, he noted, exceeds the "*longest timeframe* (eight weeks) generally accepted for a similar non-Table claim recognized in the [Vaccine] Program." *Id.* at 12 (emphasis in original) (citing *Barone v. Sec'y of Health & Hum. Servs.*, No. 11-707V, 2014 WL 6834557, at *13 (Fed. Cl. Spec. Mstr. Nov. 12, 2014)). The Chief Special Master explained that "a nine-week onset (coupled with symptoms that have not convincingly been demonstrated to be GBS-specific) is simply too remote from the date of vaccination to reasonably associate the two," and therefore did not support a finding of causation-in-fact. *Id.* (quoting *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008)). The Chief Special Master ultimately concluded that "Petitioner has not . . . persuasively established circumstances in which such an unusually lengthy post-vaccination onset could still be deemed medically acceptable," noting that Petitioner's earlier symptoms were either (1) unrelated to his GBS or (2) reflected pre-vaccination conditions. *Id.*

## B. Petitioner's Motion for Review

On February 18, 2025, Petitioner filed a Motion for Review of the Chief Special Master's Decision. ECF No. 34 (Motion or Mot.); ECF No. 35 (MFR Mem.). Petitioner raises two

objections to the Chief Special Master's Decision.  Mot. at 1–2.  *First*, that the Chief Special Master's determination that the onset of Petitioner's injury occurred outside of the 3–42-day timeframe was arbitrary and capricious.  *Id.* at 1.  *Second*, that the Chief Special Master's conclusion that Petitioner failed to prove his Table claim or his causation-in-fact claim was arbitrary and capricious.  *Id.* at 2.  On March 20, 2025, Respondent filed its Response to Petitioner's Motion, contending that Petitioner has failed to show that the Chief Special Master's Decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  ECF No. 38 (Response or Resp.) at 5.  Specifically, Respondent argues that the "Chief Special Master evaluated the entire record, drew plausible inferences, and came to a supported and reasoned decision."  *Id.* at 12.  The Motion is now fully briefed and ripe for resolution.[11]

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 300aa-12(e)(2), when ruling on a Motion for Review, this Court may:

> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

> (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

> (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2).  This Court reviews a special master's factual determinations under the arbitrary and capricious standard; legal questions under the "not in accordance with law"

---

[11] Petitioner did not request oral argument in his Motion for Review or his supporting Memorandum.  *See generally* Mot.; MFR Mem; Vaccine Rule 20(c) ("A party desiring oral argument on a motion must so request in the motion or response.").

standard; and any discretionary rulings under the abuse of discretion standard. *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 & n.10 (Fed. Cir. 1992).

The scope of this Court's review is "uniquely deferential." *Milik v. Sec'y of Health & Hum. Servs.*, 822 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993)). This Court is required to uphold the factual findings of a special master unless those findings are arbitrary or capricious. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (noting that, with respect to factual findings—particularly the "decision to credit the evidence"—"judicial review of the special master's decision is very limited"); *Munn*, 970 F.2d at 870 & n.10 (noting that the arbitrary and capricious standard is "well understood to be the most deferential possible"); *Hinton v. Sec'y of Health & Hum. Servs.*, No. 23-2161, 2025 WL 763153, at *2 (Fed. Cir. Mar. 11, 2025) (same). "The Vaccine Act makes clear that [the Court] do[es] not 'second guess' the special master's fact-intensive conclusions that are 'based upon [his] accumulated expertise in the field.'" *Hinton*, 2025 WL 763153, at *2 (quoting *Hodges*, 9 F.3d at 961). It is not this Court's role to "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (noting that a special master has discretion to determine the relative weight of the evidence, including medical records). If the special master's conclusion is "based on evidence in the record that [is] not wholly implausible," this Court is "compelled to uphold that finding as not being arbitrary or capricious." *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010) (alteration in original) (quoting *Lampe*, 219 F.3d at 1363). "[R]eversible error is extremely difficult to demonstrate if the

special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1381 (Fed. Cir. 2021) (alteration in original) (quoting *Lampe*, 219 F.3d at 1360); *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

## **DISCUSSION**

Congress enacted the Vaccine Act to compensate parties presumed or proven to be injured by certain vaccines. 42 U.S.C. § 300aa–10 *et seq.* The Program was designed to "lessen the number of lawsuits against manufacturers and provide relative certainty and generosity of compensation awards in order to satisfy petitioners in a fair, expeditious, and generous manner." *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1325–26 (Fed. Cir. 2011) (en banc) (citation modified); *see also K.G. v. Sec'y of Health & Hum. Servs.*, 951 F.3d 1374, 1380 (Fed. Cir. 2020) (citing *Cloer*, 654 F.3d at 1325) ("The Vaccine Act is a pro-claimant regime meant to allow injured individuals a fair and fast path to compensation . . . .").

The Vaccine Act grants jurisdiction to the Court of Federal Claims and the Office of Special Masters "over proceedings to determine if a petitioner . . . is entitled to compensation under the Program" for vaccine-related injuries or deaths and the amount of compensation owed. 42 U.S.C. § 300aa–12(a). Petitions alleging injuries are initially reviewed by a Special Master, who issues a decision on the petition. *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 228 (2011) (citing 42 U.S.C. §§ 300aa–11(a)(1), 300aa−12(d)(3)). To obtain compensation under the Vaccine Act, a petitioner must prove that a vaccine caused an injury. *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). There are two ways for a petitioner to do this: (1) by proving that he suffered a Table injury within the specified time window after vaccination—in which case, causation is presumed (a Table claim), or (2) by proving causation-in-fact (an off-Table claim). *de Bazan*, 539 F.3d at 1351.

Table claims are based on "a statutorily-prescribed presumption of causation" created by the Vaccine Injury Table. *Althen*, 418 F.3d at 1278; 42 U.S.C. § 300aa-14(a) (Vaccine Injury Table); 42 CFR § 100.3 (current Vaccine Injury Table). The Table identifies vaccines covered under the Vaccine Act, compensable injuries, and how soon after vaccination the first symptom or manifestation of onset must occur for purposes of receiving compensation. *Bruesewitz*, 562 U.S. at 228. If a petitioner can prove by a preponderance of the evidence that his injury meets the criteria in the Table,[12] he has successfully made a Table claim and is "prima facie entitled to compensation." *Id.*; *de Bazan*, 539 F.3d at 1351. In other words, "[b]ring the case within the timetable and specifications of a Table Injury and the statute does the heavy lifting—causation is conclusively presumed." *Hodges*, 9 F.3d at 961. The Vaccine Act includes qualifications and aids to interpretation (QAIs) which "shall apply to the Vaccine Injury Table." 42 U.S.C. § 300aa–14(b); 42 C.F.R. § 100.3(c); *see Sharpe v. Sec'y of Health & Hum. Servs.*, 964 F.3d 1072, 1078 (Fed. Cir. 2020) (noting that for a significant aggravation Table claim, the petitioner "had to demonstrate" that she experienced her alleged injury "as defined in the QAI promulgated by HHS"); *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1307–08 (Fed. Cir. 1999) (explaining that the Table is to be "read in conjunction with" the QAIs, which "provide[] explanations and definitions for terms used in the [] Table"). For example, and as relevant here, GBS is a Table injury for the flu vaccine when experienced within 3–42 days of vaccination. 42 CFR § 100.3(a)(XIV)(D); *see also Hinton*, 2025 WL 763153, at *1 n.1 ("The flu vaccine is listed

---

[12] Specifically, in a Table injury case, a petitioner must demonstrate that he meets five criteria: (1) he received a Table vaccine, *see* 42 U.S.C § 300aa-11(c)(1)(A); (2) he received the vaccine in the United States or meets a limited exception, *see id.* § 300aa-11(c)(1)(B); (3) he either suffered a Table injury or died, *see id.* § 300aa-11(c)(1)(C); (4) he suffered the "residual effects or complications" from such injury for more than six months or that such injury led to "inpatient hospitalization and surgical intervention," *see id.* § 300aa-11(c)(1)(D); and (5) he has not already collected civil damages via award or settlement for such injury, *see id.* § 300aa-11(c)(1)(E).

in the Vaccine Injury Table as known to cause GBS.").  The QAIs describe GBS as "an acute monophasic peripheral neuropathy," and state that a GBS diagnosis requires, among other things, "[a] monophasic illness pattern," and an "interval between onset and nadir of weakness between 12 hours and 28 days," followed by a "[s]ubsequent clinical plateau" leading to "stabilization at the nadir of symptoms, or subsequent improvement without significant relapse."  42 CFR § 100.3(c)(15)(i)−(ii).

Alternatively, where the petitioner alleges an off-Table claim—i.e., claims an injury not listed in the Vaccine Injury Table, or which first appears outside of the time limits set by the Table—"the heavy lifting must be done by the petitioner" to prove causation-in-fact.  42 U.S.C. § 300aa-11(c)(1)(C)(ii); *Hodges*, 9 F.3d at 961; *Althen*, 418 F.3d at 1278.  This burden "is heavy indeed."  *Hodges*, 9 F.3d at 961.  To prove causation for such an off-Table claim, a petitioner must prove by a preponderance of the evidence that his vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury."  *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999).  To make this showing, a petitioner must prove each of the three *Althen* prongs by a preponderance of the evidence:

(1)     a medical theory causally connecting the vaccination and the injury;

(2)     a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and

(3)     a showing of a proximate temporal relationship between vaccination and injury.

*Althen*, 418 F.3d at 1278; *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1354–55 (Fed. Cir. 2019) (quoting *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321–22 (Fed. Cir. 2010)); *Oliver v. Sec'y of Health & Hum. Servs.*, 900 F.3d 1357, 1361 (Fed. Cir. 2018) (quoting *Althen*, 418 F.3d at 1278); *see also Henkel v. Sec'y of Health & Hum. Servs.*, No. 23-1894, 2024 WL 3873569, at *1 (Fed. Cir. Aug. 20, 2024) ("Because we conclude that the special

master's finding on *Althen* prong three was not arbitrary or capricious . . . and because Appellants needed to prevail on all three prongs to have their petition granted, we affirm the petition's denial without reaching the prong-two finding.").

"Once a petitioner establishes a prima facie case, the government then bears the burden of establishing alternative causation by a preponderance of the evidence." *Cedillo*, 617 F.3d at 1335 (citing *Walther v. Sec'y of Health & Hum. Servs.*, 485 F.3d 1146, 1151 (Fed. Cir. 2007)). After such a burden shift, the respondent must demonstrate by a preponderance of the evidence that the injury described in the petition was caused by factors unrelated to the administration of the vaccine described in the petition. 42 U.S.C. § 300aa–13(a)(1)(B); *Althen*, 418 F.3d at 1278 (citing *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 547 (Fed. Cir. 1994)). However, if the petitioner fails to establish a prima facie case, the burden does not shift to the respondent. *See Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349, 1358 (Fed. Cir. 2010). Regardless of whether the burden shifts, the special master may consider evidence of alternative causation presented by the respondent in determining whether the petitioner has established a prima facie case, as the special master is to consider the record as a whole in determining causation where multiple possible sources of injury may exist. *de Bazan*, 539 F.3d at 1353; *Stone v. Sec'y of Health & Hum. Servs.*, 676 F.3d 1373, 1379–80 (Fed. Cir. 2012).

Here, Petitioner raises two objections to the Chief Special Master's Decision.[13] Mot. at 1–2. *First*, he argues that the Chief Special Master's determination that the onset of Petitioner's

---

[13] Petitioner's GBS diagnosis is not disputed. Resp. Rule 4(c) Report at 12 ("Respondent agrees that the diagnosis of GBS in petitioner is medically sound . . . ."); ECF No. 28 at 6 ("The diagnosis of GBS is not in dispute in this case."). Although Petitioner makes passing references to concerns about the procedures the Chief Special Master followed in this case, Petitioner has waived any such argument as he failed to expressly raise such a procedural argument in his Motion. MFR Mem. at 7, 14–15 & n.2, 19; *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are

symptoms occurred on January 5, 2018—outside of the 3–42-day window required by the Table—was arbitrary and capricious.[14]  *Id.* at 1.  *Second*, Petitioner argues that the Chief Special Master's conclusion that Petitioner has not established a Table claim or an off-Table causation-in-fact claim was arbitrary and capricious.  *Id.* at 2.

While this Court greatly empathizes with Petitioner, it is nevertheless bound by—and must dutifully apply—the law.  Having considered the medical records, medical literature, and affidavits in the record and applicable law, for the reasons explained below, this Court rejects both of Petitioner's objections and holds that the Chief Special Master's conclusions were not arbitrary or capricious.  Particularly "[g]iven the exacting 'arbitrary and capricious' standard of review that applies to factual findings in Vaccine Act cases, [the Court] accept[s] the special master's weighing

---

waived."); *Hodge ex rel. Elson v. Sec'y of Health & Hum. Servs.*, 168 Fed. Cl. 117, 129 n.13 (2023) ("Because petitioner did not explicitly raise such an argument, she has waived it."); *Miller v. Sec'y of Health & Hum. Servs.*, 172 Fed. Cl. 762, 779 (2024) (concluding that the petitioner waived her challenge to a specific finding of the special master, where she "failed to state it as an objection or adequately raise it in her Motion for Review or Memorandum of Objections"); *see also* Vaccine Rule 24 (requiring that a motion for review of a special master's decision must "be accompanied by a memorandum of numbered objections to the decision" which "fully and specifically state[s] and support[s] each objection" to the special master's decision).  Additionally, in his supporting Memorandum, Petitioner states that "it is error of law to state that Petitioner 'failed to meet his burden' here."  MFR Mem. at 7.  However, in his Motion, Petitioner objects to the Decision on the basis that two of the Chief Special Master's conclusions were arbitrary and capricious.  In any event, resolving the objections Petitioner raises "entails primarily . . . factual work."  *Echols v. Sec'y of Health & Hum. Servs.*, 165 Fed. Cl. 9, 16 (2023) (quoting *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge*, *LLC*, 138 S. Ct. 960, 967 (2018)).  Accordingly, the Court reviews the Chief Special Master's conclusions—which are factual in nature—under the arbitrary and capricious standard.  *Munn*, 970 F.2d at 870 & n.10 ("Fact findings are reviewed by [the Federal Circuit], as by the [Court of Federal Claims], under the arbitrary and capricious standard . . . .").

[14] Petitioner received the flu vaccine on November 1, 2017.  Decision at 1; *see also* Pet. Ex. 3 at 2174−75.  Thus, to satisfy the timing requirement of the Table, Petitioner's GBS symptoms must have first occurred sometime on November 4, 2017 through December 13, 2017.

of the evidence in this case." *Hinton*, 2025 WL 763153, at *5 (quotations and first alteration in original) (quoting *Lampe*, 219 F.3d at 1362). The Chief Special Master's Decision is sustained.

## I.    The Chief Special Master's Onset Determination Was Not Arbitrary or Capricious.

Petitioner argues that he provided "clear evidence"—in the form of affidavits and medical records—that the onset of his GBS symptoms occurred within the 3–42-day window required to assert a Table injury. MFR Mem. at 10. Therefore, Petitioner contends, the Chief Special Master's conclusion that Petitioner's onset occurred outside of the Table timeframe is arbitrary and capricious. *Id.* at 8–14. Respondent counters that the Chief Special Master "properly considered the relevant medical records, drew reasonable inferences, and rationally explained that the contemporaneous medical records preponderantly establish that the initial symptoms of petitioner's GBS occurred on January 5, 2018, sixty-five days after his vaccination." Resp. at 13.

As explained more fully below, the Court concludes that the Chief Special Master's onset determination was not arbitrary or capricious, as he "considered the relevant evidence of record, dr[ew] plausible inferences and articulated a rational basis" in support of his conclusion that Petitioner's symptoms first occurred on January 5, 2018. *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360). Nothing in the Chief Special Master's Decision suggests that he failed to "consider[] the relevant evidence of record." *Hines*, 940 F.2d at 1528. On the contrary, the Chief Special Master affirmatively indicated that "the complete record was reviewed and considered."[15] Decision at 9 n.4. His findings of fact, which provide a detailed summary of the evidence, and his analysis, which addresses all of the symptoms Petitioner claims mark an earlier onset, make clear that he did so. *Id.* at 2–7, 9–12. As explained further below, the Chief Special Master considered

---

[15] Indeed, even absent such an affirmative statement, under Federal Circuit precedent, "[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision." *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016).

Petitioner's affidavit evidence, drew plausible inferences, articulated a rational basis for his conclusions, and did not ignore in Petitioner's medical records symptoms occurring within 3–42 days of vaccination.

### A. The Chief Special Master Considered Petitioner's Affidavit Evidence, and Drew "Plausible Inferences and Articulated a Rational Basis" for His Conclusions.

Petitioner argues that both his affidavit and Mr. Edelman's affidavit place the onset of his GBS within the 3–42-day Table timeframe. MFR Mem. at 10, 12. The Decision, however, reflects that the Chief Special Master considered, appropriately weighed, and "dr[ew] plausible inferences and articulated a rational basis" for his conclusion that the affidavits submitted by Petitioner and Mr. Edelman did not provide the necessary support to prove onset before January 5, 2018. *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360).

*First*, the Chief Special Master considered the statements in Petitioner's affidavit and "articulated a rational basis" for concluding that they do not provide the necessary support for a successful Table claim. *Id.*; *see* MFR Mem. at 10 (citing Kindle Aff. ¶¶ 5, 6) ("Mr. Kindle explains that within a few days after the shot, he did not feel well. This continued, and within a few weeks, Mr. Kindle was feeling pain in his lower back and pain in his legs. He continued to get sick. Mr. Kindle's symptoms got worse, and he developed new symptoms." (internal citations omitted)). The Chief Special Master reasoned that Petitioner's statement that he did not feel well within a few days of receiving the vaccine was "far too vague" to support Petitioner's claim. Decision at 10. Specifically, the Chief Special Master explained that it was unclear what symptoms Petitioner experienced and precisely when he experienced those symptoms. *Id.* The Chief Special Master supported his analysis of Petitioner's affidavit with evidence in Petitioner's medical records. *Id.* Six days after receiving the vaccine, Petitioner had an appointment related to his gout, but "did not mention anything in association to the vaccination he had recently received." *Id.*; *see also* Pet. Ex.

3 at 2169−73 (records from that appointment). It was reasonable for the Chief Special Master to infer that Petitioner likely would have mentioned generalized complaints of "not feeling well" when he saw his rheumatologist shortly after receiving the vaccine—particularly in view of the thoroughness of the examination Petitioner appears to have undergone in that appointment. *See* Pet. Ex. 3 at 2171; *see also Kirby*, 997 F.3d at 1383 (quoting Fed. R. Evid. 803 advisory committee's note to 1975 enactment) (explaining that medical records are not presumed to be accurate and complete, but patients nevertheless have a "strong motivation to be truthful" to their doctors). In sum, the Chief Special Master "articulated a rational basis" for his conclusion regarding Petitioner's affidavit, based on logical inferences and Petitioner's own medical records. *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360).

*Second*, as with Petitioner's own affidavit, the Chief Special Master "articulated a rational basis" for declining to give Mr. Edelman's statements weight. *Id.*; Decision at 10. Mr. Edelman stated that he started to notice issues with Petitioner in early December 2017, including coughing, sweating, urinary issues, appetite issues, weakness, trouble standing, and trouble walking. Edelman Aff. ¶¶ 3, 5−7. The Chief Special Master observed that Mr. Edelman's affidavit was temporally vague, as Mr. Edelman was "unable to provide specific dates, or even a range of potential dates" that Petitioner had stayed in his home. Decision at 10. The Chief Special Master also reasoned that, although Mr. Edelman noted that Petitioner was coughing around Christmas (which aligned with Petitioner's medical records), the onset of Petitioner's cough was around Christmas day—"almost two weeks *after* the 42-day timeframe window for manifestation of GBS symptoms would have closed." *Id.* (emphasis in original). Further, the Chief Special Master noted that "respiratory symptoms do not reflect the kind of neurologic concerns that would stand as GBS's onset." *Id.*

Although Mr. Edelman's statement that Petitioner "started to notice issues in early December of 2017," including weakness and trouble standing and walking, arguably could provide some support for Petitioner's claim, the broad discretion to weigh evidence is "within the purview of [the special master as] the fact finder." *Porter*, 663 F.3d at 1249; *see R.J. ex rel. W.J. v. Sec'y of Health & Hum. Servs.*, 93 F.4th 1228, 1235 (Fed. Cir. 2024) ("It is within a special master's discretion to weigh evidence."); *see also Munn*, 970 F.2d at 869 (noting that this Court plays "the role of a reviewing judge" in cases brought under the Vaccine Act). In view of the record as a whole, the Chief Special Master concluded that Mr. Edelman's statement did not provide the necessary support for Petitioner's claim.

Reversible error is "extremely difficult to demonstrate" where, as here, the special master has "considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision." *Hines*, 940 F.2d at 1528. Here, the Chief Special Master clearly did so. The Chief Special Master reasoned that Petitioner's evidence of an earlier onset as a whole—which included this statement by Mr. Edelman—demonstrated that Petitioner's earlier symptoms were "either unrelated to his GBS" or "reflect pre-vaccination conditions." Decision at 12. It was plausible for the Chief Special Master to infer that the weakness Mr. Edelman noticed in early December 2017 was unrelated to Petitioner's GBS, given Petitioner's history of numerous, significant medical issues. *Id.* at 2 (citing Pet. Ex. 3 at 391, 1054, 1218, 2179) ("Petitioner's prior history includes chronic kidney disease, hypertension, suspected hypertrophic cardiomyopathy, hypothyroidism, obesity, obstructive sleep apnea, gout, and septic arthritis of his right knee."); *see also id.* at 4 (citing Pet. Ex. 3 at 2124) (noting that Petitioner had not been taking his thyroid medication and that an attending nurse attributed his complaints of weakness in January to Petitioner's failure to take his medication); *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d

1525, 1528 (Fed. Cir. 1993) ("Medical records, in general, warrant consideration as trustworthy evidence."); *Rogero v. Sec'y of Health & Hum. Servs.*, 748 F. App'x 996, 1001 (Fed. Cir. 2018) ("Determinations of relative weight of different evidence are generally for the trier of fact.").

In sum, the Chief Special Master considered Petitioner's affidavit evidence, but articulated rational bases—grounded in logical inferences and record evidence—to conclude that this evidence did not indicate symptom onset during the time period provided by the Table.[16]

### B. The Chief Special Master Did Not Ignore Evidence of GBS Symptoms Occurring Within 3–42 Days of Vaccination in Petitioner's Medical Records.

Petitioner next contends that the Chief Special Master ignored evidence in Petitioner's medical records supporting onset during the Table timeframe. MFR Mem. at 12 (citing Decision at 9−10). After a review of the record, the Court concludes the Chief Special Master considered the symptoms Petitioner claims were ignored and "articulated a rational basis" for concluding that they were not evidence of GBS. *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360).

As an initial mater, although Petitioner argues that the Chief Special Master "ignore[d] the additional evidence provided by the medical chart," in his Motion, Petitioner cites specific pages of the Decision in which the Chief Special Master addressed each of these symptoms. *See* MFR Mem. at 12–14 (citing Decision at 9–11). Further, when addressing Petitioner's evidence of an earlier onset generally, the Chief Special Master reasoned that "Petitioner's assertions about an earlier onset . . . would describe a GBS course wholly inconsistent with what is known about the illness"—specifically referencing the fact that "in the vast majority of cases" the disease is "acute

---

[16] The Court also notes that both affidavits were signed years after the initial onset of Petitioner's GBS. *See* Kindle Aff. at 3 (signature dated October 19, 2020); Edelman Aff. at 2 (signature dated August 1, 2022); *Perkins v. Sec'y of Health & Hum. Servs.*, No. 17-487V, 2021 WL 4877825, at *8 (Fed. Cl. Aug. 27, 2021) (sustaining a special master's decision which found "contemporaneous medical records more reliable [than affidavits and testimony] because of the risk of confusion when witnesses were recalling events from four years prior").

and monophasic." Decision at 11 (citing *Chinea*, 2019 WL 1873322, at \*31, 33). This is precisely the kind of finding that warrants deference, given special masters' "accumulated expertise" regarding vaccines and associated injuries. *Hodges*, 9 F.3d at 961; *see also Munn*, 970 F.2d at 871 ("It is, after all, the special masters to whom Congress has accorded the status of expert, entitling them to the special statutory deference in fact-finding normally reserved for specialized agencies."). Further, this understanding of GBS as "acute and monophasic" comports with the statutory definition of GBS under the Vaccine Act. 42 C.F.R. § 100.3(c)(15)(i), (ii) (defining GBS as an "acute monophasic peripheral neuropathy" and noting that a GBS diagnosis requires "[a] monophasic illness pattern"). It is also well-documented in Petitioner's own medical records. *See* Pet. Ex. 3 at 153 ("We again discussed that AIDP is a monophasic illness and that his active disease occurred in January . . . ."); *id.* at 1439 ("[H]is illness is consistent with AIDP variant of GBS, which is a monophosic [sic] illness."). As explained further below, the Chief Special Master fully considered each of the symptoms that Petitioner contends evidenced an earlier onset of his GBS— (1) eye symptoms, (2) dizziness, and (3) back pain—and provided a reasonable explanation as to why they were insufficient to support a Table claim.

### 1.    Eye Symptoms

As noted in the Chief Special Master's Decision, the only encounter Petitioner had with a medical professional within 3–42 days of vaccination, other than the November 7, 2017 rheumatology appointment referenced above and call to a nurse that same day to request a consultation for "recurrent conjunctivitis,"[17] was Petitioner's visit to the Dallas VA to request an

---

[17] Petitioner's medical records also note that in November, the radiology department unsuccessfully attempted to contact Petitioner regarding scheduling an ultrasound appointment ordered by one of his doctors, and that, also in November, a nurse unsuccessfully attempted to contact Petitioner. Pet. Ex. 3 at 2164−65. Additionally, Petitioner spoke to a research coordinator and physician that month to confirm his withdrawal in a gout study. *Id.* at 2163; *see supra* Background § I.A.1. These records are not pertinent to Petitioner's arguments.

ophthalmology consultation on December 13, 2017.  Decision at 10; Pet. Ex. 3 at 2169−73 (records from rheumatology appointment); Pet. Ex. 3 at 2173 (noting Petitioner's November 7, 2017 request for an ophthalmology consultation for "recurrent conjunctivitis" which, according to Petitioner, he had discussed with Dr. Wixtrom "a few days ago"); Pet. Ex. 3 at 2159−83 (medical records from November 1, 2017 (vaccination date) to December 13, 2017 (Table timeframe end date)).  Petitioner argues that his report of "chronic eye pain" during that call (which took place on the last day within the Table timeframe) and records from his December 21, 2017 appointment, which note that Petitioner experienced double vision and "[o]cular motility: orthotropia with full ductions and versions OU," suggest that his GBS onset occurred within the Table timeframe.  MFR Mem. at 10–13; Pet. Ex. 3 at 2152.[18]  Petitioner contends that pain and difficulty controlling eye movement can be symptoms of GBS, but concedes—as he must—that the symptom reported on December 21, 2017 occurred more than 42 days post-vaccination.[19]  MFR Mem. at 13 (citing Yale Medicine at 2).

The Chief Special Master considered Petitioner's eye symptoms and "articulated a rational basis" for concluding that they did not indicate that Petitioner's GBS onset occurred within the Table timeframe.  *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360).  Indeed, it is evident on the face of the Decision that the Chief Special Master considered Petitioner's eye symptoms.

_____

[18] Records from the December 21, 2017 appointment note "[t]ransient (sev minutes) horiz diplopia resolved completely by unilat occlusion, yesterday, first episode"; "[o]cular motility: orthotropia with full ductions and versions OU"; and "acute transient diplopia."  Pet. Ex. 3 at 2151–52.  As noted, "motility" can mean "spontaneous but unconscious or involuntary movement," but also refers generally to the "condition of being capable of movement."  *See supra* note 4.

[19] Specifically, Petitioner's medical records indicate that he experienced the onset of horizontal diplopia beginning on December 20, 2017—49 days post-vaccination, and a week after the Table timeframe had closed.  *See* Pet. Ex. 3 at 2151.

Decision at 2–3, 8, 10, 11. The Chief Special Master made the broader point that GBS "is not known to present with bouts of eye or audiological issues prior to neurological symptoms, and which subsequently remain subacute for weeks or months." *Id.* at 11 (citing *Chinea*, 2019 WL 1873322, at *31, 33). This conclusion was also supported by Petitioner's medical literature, which notes that "[w]eakness and tingling in your hands and feet are usually the first symptoms" of GBS. Mayo Clinic at 1. The Chief Special Master further noted that Petitioner's medical records reflect "that Petitioner had been dealing with 'stringy mucous discharge' since the 1970s—a preexisting condition as opposed to something new." Decision at 10 (quoting Pet. Ex. 3 at 2151); *see also* Pet. Ex. 4 at 314–16 (noting that Petitioner suffered "[o]rbit trauma in service" and "has had mucus/eye irritation for decades").[20] These findings and records ultimately supported the Chief Special Master's conclusion that Petitioner's earlier symptoms (including, but not limited to, his chronic eye pain, double vision, and any difficulty controlling eye movement) were "either unrelated to his GBS, or reflect pre-vaccination conditions." Decision at 12.

Petitioner also contends that the Chief Special Master's reference to the fact that "Petitioner himself related his [eye] symptoms to conjunctivitis" is improper, because "Petitioner is not a medical professional" and "it is normal for individuals giving a personal history to physicians to bring up previous stories from their past medical history." MFR Mem. at 12−13 (citing Decision at 10). But this line of reasoning was supplemental, and not critical to, the Chief Special Master's analysis, which relied primarily on Petitioner's medical records evincing a history of eye-related problems. *See* Decision at 10−11 (citing Pet. Ex. 3 at 2151). Thus, any error in the Chief Special

---

[20] "Orbit trauma" is shorthand for orbital trauma, which refers to an injury to the eye socket. *See Orbit*, *Mosby's Medical Dictionary* (10th ed. 2017) (defining orbit as "one of a pair of bony, conical cavities in the skull that accommodate the eyeballs and associated structures").

Master's reasoning was harmless.[21]  *Hines*, 940 F.2d at 1526 (finding harmless error where "the special master's decision was based on a number of factors and [petitioner had] not shown that reliance on the . . . [contested issue] was likely critical to the result").

In sum, the Chief Special Master considered Petitioner's eye symptoms and reasonably found them not to be evidence of an earlier onset of his GBS, in view of Petitioner's history of eye-related ailments and because GBS is not known to present with eye issues prior to neurological issues.  Decision at 10−11.  It is therefore clear that the Chief Special Master "articulated a rational basis" for his conclusion.  *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360).

### 2.    Dizziness

Petitioner also argues that his report of "continued dizziness when standing/standing up to walk" in a December 19, 2017 audiology consultation indicates GBS symptom onset within the Table timeframe.  MFR Mem. at 11 (emphasis omitted) (quoting Pet. Ex. 3 at 2158) ("Since the records state 'continued dizziness,' then this symptom manifested before December 19, 2017."); *id.* at 14 (citing Mayo Clinic); Pet. Ex. 3 at 2158 ("Veteran has limited to no concerns regarding

---

[21] The Court notes that the Chief Special Master's statement that "Petitioner himself related his [eye] symptoms to conjunctivitis" appears to refer to the "Assessment" portion of the records from Petitioner's December 21, 2017 appointment, which restates Petitioner's history of eye-related problems.  Decision at 10; Pet. Ex. 3 at 2151; *see supra* note 5.  Specifically, under an entry entitled, "Meibomian gland dysfunction" the Assessment states: "1/7/15: He also believes that he needs a conjunctival culture because around 10/2014 he took some amoxicillin for a UTI and also happened to have some relief of his eye symptoms."  Pet. Ex. 3 at 2152.  The Chief Special Master appears to have understood this to reference a contemporaneous statement made by Petitioner. Whether the statement was made in the past or contemporaneously in Petitioner's appointment, it supports the Chief Special Master's conclusion that Petitioner's eye symptoms were not GBS-related.  The Chief Special Master found Petitioner's reference to his conjunctivitis significant, not because it was an accurate self-diagnosis—but instead because it indicated that Petitioner had a history of eye-related complications.  Decision at 2−3 (citing Pet. Ex. 3 at 2151), 10, 11.  As explained above, Petitioner's history of eye-related complications is well-documented in the record.

changes in hearing since last evaluation, but notes continued dizziness when standing/standing up

to walk.").

After a review of the Decision and record, the Court concludes that the Chief Special

Master appropriately found Petitioner's contention with respect to his dizziness "unpersuasive,"

given the acute and monophasic nature of GBS. *See* Decision at 11. The Chief Special Master

expressly considered Petitioner's reported dizziness. *Id.* at 3, 10–11. And it was reasonable for

the Chief Special Master to not be persuaded by this fact. It does not necessarily follow from a

December 19, 2017 report of "continued dizziness when standing/standing up to walk" that

Petitioner experienced dizziness sometime between November 4, 2017 and December 13, 2017,

as required by the Table. Read in context, "continued" could simply mean that Petitioner

experienced prolonged dizziness after standing up; the records are not clear on what days Petitioner

experienced that dizziness. Further, given Petitioner's acute manifestation of GBS symptoms in

early January and contemporaneous medical records supporting that the reported dizziness was

not GBS-related, the Chief Special Master could reasonably infer that Petitioner's dizziness was

unrelated to his GBS. *See id.* at 11 (citing *Chinea*, 2019 WL 1873322, at *31, 33) (reasoning that

GBS "is not known to present with bouts of eye or audiological issues prior to neurological

symptoms, and which subsequently remain subacute for weeks or months"); *see also* Pet. Ex. 3 at

2188−89 (Petitioner reporting "occasional orthostatic dizziness"[22]—dizziness when standing up—

roughly a month prior to vaccine administration); Pet. Ex. 3 at 2202−03 (noting Petitioner's

complaint of "weakness in his legs and vertigo as well as fatigue" on September 15, 2017); Pet.

Ex. 3 at 2178−79 (noting Petitioner's prior history of vertigo). The Mayo Clinic article Petitioner

---

[22] "Orthostatic" means "pertaining to an erect or standing position." *Orthostatic*, *Mosby's Medical Dictionary* (10th ed. 2017).

cites does not undermine the reasonableness of this conclusion.  *See* MFR Mem. at 14 (citing Mayo Clinic).  Although Petitioner correctly notes that the article lists "rapid heart rate" and "[l]ow or high blood pressure" as symptoms of GBS, the article states that "weakness" and "tingling in [the patient's] hands and feet are usually the first symptoms" of GBS—not dizziness.  Mayo Clinic at 1–3; *see* MFR Mem. at 14 (citing Mayo Clinic).

In sum, the Chief Special Master considered Petitioner's complaint of dizziness and reasonably relied on "what is known" about GBS, to conclude that Petitioner's dizziness did not indicate GBS onset within the Table timeframe.  Decision at 11.  The Court therefore accepts the Chief Special Master's weighing of the evidence in this respect.  *Hinton*, 2025 WL 763153, at *5 (quoting *Lampe*, 219 F.3d at 1362).

### 3.    Back Pain

Petitioner next contends that his December 20, 2017 medical records reflecting lower back pain and pain in his legs "with an inciting even[t] that occurred 10 days ago," along with records stating that he experienced back pain "as early as mid-December," indicate a GBS onset within the Table timeframe.  MFR Mem. at 11–12 (first quoting Pet. Ex. 3 at 2156; and then citing Pet. Ex. 3 at 2023–24) (alteration added and emphasis omitted).

The Chief Special Master considered Petitioner's lower back pain and "articulated a rational basis" for his conclusion that it did not mark the onset of Petitioner's GBS.  *Kirby*, 997 F.3d 1381 (quoting *Lampe*, 219 F.3d at 1360).  Specifically, the Chief Special Master provided three reasons supporting his conclusion: (1) Petitioner himself believed that bending over in the shower caused his pain; (2) Petitioner's doctor assessed the back pain as a "sprain/strain" that first occurred 10 days prior; and (3) Petitioner had a longstanding history of back pain.  Decision at 11.  These rationales are well-documented in the medical records.  *Id.* at 3 (citing Pet. Ex. 3 at 2153 ("Resently [sic] the paitent [sic] leaned over in shower and got pain accross [sic] his whole lower

back. He didn't feel any big issues after this.")); *id.* (citing Pet. Ex. 3 at 2156 (noting that Petitioner

had back pain "with an inciting even[t] that occurred 10 days ago" which "is most likely due to a

sprain/strain")); *see also* Pet. Ex. 3 at 2158 ("Exam consistent with DDD [degenerative disc

disease] and recent onset of lumbar sprain/strain[.]"); Pet. Ex. 3 at 2153 (noting onset of back

problems in 1966 and that Petitioner "jumped from 35 ft up" when he was in the Marine Corps).

As the Chief Special Master noted, Petitioner's history of back pain "was significant enough that

an MRI was performed on his back in 2016," and Petitioner's back pain was one of the reasons he

saw his PCP on November 1, 2017—the appointment in which Petitioner received the flu vaccine.

Decision at 2 (citing Pet. Ex. 3 at 2180); *id.* at 11; Pet. Ex. 3 at 2101, 2105. Thus, the Chief Special

Master considered Petitioner's back pain and articulated a rational basis—founded upon evidence

in Petitioner's medical records—for his conclusion that Petitioner's back pain was not related to

his GBS.

That the onset of this back pain occurred within the Table timeframe—specifically on

December 10, 2017, does not assist Petitioner's claim here. *See* MFR Mem. at 11 (citing Pet. Ex.

3 at 2156) ("It is important to note that the assessment states "chronic lower back pain with an

inciting even[t] that occurred 10 days ago." (alteration added and emphasis omitted)). The crux

of the Chief Special Master's reasoning was not that Petitioner did not experience any back pain

during the Table timeframe. On the contrary, the Chief Special Master recognized that Petitioner

experienced such symptoms and, considering Petitioner's medical records as a whole, reasonably

attributed them to something other than GBS based on Petitioner's medical history and the

statements of his treating physicians. Decision at 11 (first citing Pet. Ex. 3 at 2156; and then citing

Pet. Ex. 3 at 2180). For this same reason, Petitioner's argument that "the scope of his pain is

extensive as the records state 'across the whole back and now going down the left side of the leg

to just above the knee on the posterior side'" is unavailing.  MFR Mem. at 11 (quoting Pet. Ex. 3 at 2153).

Petitioner references a case study concluding that "low back pain is a common symptom of GBS," which can delay diagnosis when it presents as an early symptom of GBS—particularly when it does not present with the characteristic muscle weakness.  *Id.* at 14 (quoting Ding) (emphasis omitted).  However, as the Chief Special Master noted, Petitioner had a long history of back pain, and Petitioner's treating physician associated his back pain with a sprain or strain.  Decision at 11; Pet. Ex. 3 at 2156−58 ("Lower back pain due to sprain/strain"); Pet. Ex. 3 at 2158 ("Exam consistent with DDD [degenerative disc disease] and recent onset of lumbar sprain/strain[.]"); Pet. Ex. 3 at 2153 ("In marine corp [sic] he jumped from 35 ft up.  At that time he felt a dullness in his back."); Pet. Ex. 3 at 2153 ("ONSET: first event 1966"); *Cucuras*, 993 F.2d at 1528 ("Medical records, in general, warrant consideration as trustworthy evidence."). Thus, the Chief Special Master weighed the evidence in the medical records against the evidence in the medical literature and concluded that it was not preponderantly likely that Petitioner's back pain was GBS-related.  The broad discretion to weigh evidence is "within the purview of [the special master as] the fact finder."  *Porter*, 663 F.3d at 1249; *see also R.J. ex rel. W.J.*, 93 F.4th at 1235 ("It is within a special master's discretion to weigh evidence.").  Particularly in view of the substantial medical evidence supporting that Petitioner's back pain was unrelated to his GBS, the Court declines to "'second guess' the special master's fact-intensive conclusions that are 'based upon [his] accumulated expertise in the field.'"  *Hinton*, 2025 WL 763153, at *2 (quoting *Hodges*, 9 F.3d at 961)).

\*     \*     \*     \*     \*

In sum, the evidence of symptoms Petitioner points to in the Table timeframe consists only of Petitioner's affidavits, his December 13, 2017 report of chronic eye pain (despite that Petitioner had a history of eye-related issues), back pain "within an inciting even[t]" on December 10, 2017 (which his doctors attributed to a sprain, not GBS), and a suggestion that he may have experienced dizziness within the Table timeframe.  After a review of the record, the Chief Special Master weighed this evidence, as is within his discretion, drew plausible inferences, and "articulated a rational basis" for his conclusion that Petitioner's GBS onset did not occur until January 5, 2018— well after the Table timeframe closed.  *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360); *R.J. ex rel. W.J.*, 93 F.4th at 1235.  The record supports his conclusion.  Pet Ex. 3 at 2151 (noting that Petitioner complained of "stringy mucous discharge [in both eyes] since [the] 1970s"); *id.* at 2156−58 (attributing lower back pain to "sprain/strain"); *id.* at 2188−89 (Petitioner reporting "occasional orthostatic dizziness" roughly a month prior to vaccine administration); *id.* at 2052 (Petitioner reporting on January 10, 2018, that "he was in his usual state of physical and psychological health until 'after Christmas'").  Whether another judge or special master would have evaluated the evidence differently is of no moment; "the law is settled that neither the Court of Federal Claims nor the Federal Circuit can substitute its judgment for that of the special master merely because it might have reached a different conclusion."  *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009); *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1349 (Fed. Cir. 2010) (quoting *Munn*, 970 F.2d at 871) ("This court does not 'reweigh the factual evidence, or [ ] assess whether the special master correctly evaluated the evidence.  And of course we do not examine the probative value of the evidence or the credibility of the witnesses.

These are all matters within the purview of the fact finder.'").  Accordingly, the Court finds that the Chief Special Master's onset determination was not arbitrary or capricious.

## II.    The Chief Special Master's Conclusion That Petitioner Failed to Establish a Table or Off-Table Claim Was Not Arbitrary or Capricious.

Petitioner contends that the Chief Special Master's conclusion that Petitioner failed to meet his burden to prove a Table or off-Table claim is arbitrary and capricious.  Mot. at 2; MFR Mem. at 14–20.  The Court holds that the Chief Special Master properly determined that Petitioner did not carry his burden of proving either his Table claim or his off-Table claim.

### A.    The Chief Special Master's Conclusion that Petitioner Did Not Prove His Table Claim Was Not Arbitrary or Capricious.

Petitioner's Table claim rises and falls with the Chief Special Master's onset determination, as none of the other Table requirements are in dispute.  *See supra* note 12; *see generally* Mot.; MFR Mem.; Resp.  Thus, for the same reasons the Court concluded above that the Chief Special Master's onset determination was not arbitrary and capricious, Petitioner's argument with respect to his Table claim fails.

### B.    The Chief Special Master's Conclusion that Petitioner Did Not Prove His Off-Table Claim Was Not Arbitrary or Capricious.

The Court also rejects Petitioner's alternative argument that Mr. Kindle has proven a causation-in-fact claim.  MFR Mem. at 14.  For the reasons explained below, the Chief Special Master's conclusion that Petitioner has not established causation-in-fact was not arbitrary or capricious.

As noted, to prove causation-in-fact under the Vaccine Act for an off-Table claim, a petitioner must prove by a preponderance of the evidence each of the three *Althen* prongs: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a

proximate temporal relationship between vaccination and injury. *Althen*, 418 F.3d at 1278. In an off-Table claim, "the heavy lifting must be done by the petitioner" to prove causation-in-fact, and this burden is "heavy indeed." *Hodges*, 9 F.3d at 961. Failure to prove any one of the *Althen* prongs is dispositive. *Oliver*, 900 F.3d at 1361; *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 F. App'x 976, 980 (Fed. Cir. 2014) ("Because petitioners must meet their burden under all three *Althen* factors to prevail, a failure to do so on any one of these factors is dispositive.").

The Chief Special Master properly concluded that Petitioner had not proven his off-Table claim because the nine-week delay from Petitioner's vaccination to his symptom onset "is too lengthy to be considered 'medically acceptable to infer causation-in-fact.'" Decision at 12 (quoting *de Bazan*, 539 F.3d at 1352). Relying on his "accumulated expertise in the field," the Chief Special Master reasoned that nine weeks exceeded "the *longest timeframe* (eight weeks) generally accepted for a similar non-Table claim recognized in the [Vaccine] Program." *Id.* at 12 (emphasis in original) (citing *Barone*, 2014 WL 6834557, at *13); *Hodges*, 9 F.3d at 961; *see also Hinton*, 2025 WL 763153, at *2 ("The Vaccine Act makes clear that we do not 'second guess' the special master's fact-intensive conclusions that are 'based upon [his] accumulated expertise in the field.'" (quoting *Hodges*, 9 F.3d at 961)). The Chief Special Master ultimately concluded that "Petitioner has not otherwise persuasively established circumstances in which such an unusually lengthy post-vaccination onset could still be deemed medically acceptable – especially since Petitioner's earlier symptoms are either unrelated to his GBS, or reflect pre-vaccination conditions." Decision at 12. The upshot of the Chief Special Master's analysis was that the nine-week timeframe, taken together with "symptoms that have not convincingly been demonstrated to be GBS-specific" was "simply too remote" to infer vaccine causation. *Id.*

This conclusion was not arbitrary or capricious. It is well-established "that the proximate temporal relationship prong requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan*, 539 F.3d at 1352. It was permissible and reasonable for the Chief Special Master to rely on his own "accumulated expertise," as well as that of other special masters who have also declined to find more than an eight-week delay between flu vaccination and GBS symptom onset supportive of an inference of causation. *Hodges*, 9 F.3d at 961 ("Congress assigned to a group of specialists, the Special Masters within the Court of Federal Claims, the unenviable job of sorting through these painful cases and, based upon their accumulated expertise in the field, judging the merits of the individual claims."); *Doe v. Sec'y of Health & Hum. Servs.*, 76 Fed. Cl. 328, 338–39 (2007) ("One reason that proceedings are more expeditious in the hands of special masters is that the special masters have the expertise and experience to know the type of information that is most probative of a claim."); *Simeone v. Sec'y of Health & Hum. Servs.*, No. 20-1375V, 2023 WL 5286292, at *7 n.7 (Fed. Cl. Spec. Mstr. Feb. 24, 2023), *review denied*, 167 Fed. Cl. 389 (2023) (noting that special masters would "be remiss in ignoring prior cases presenting similar theories or factual circumstances, along with the reasoning employed in reaching such decisions"); *see also Barone*, 2014 WL 6834557, at *13; *Aguayo v. Sec'y of Health & Hum. Servs.*, No. 12-563V, 2013 WL 441013, at *3–4 (Fed. Cl. Spec. Mstr. Jan. 15, 2013); *Corder v. Sec'y of Health & Hum. Servs.*, No. 08-228V, 2011 WL 2469736, at *27–29 (Fed. Cl. Spec. Mstr. May 31, 2011); *De La Cruz v. Sec'y of Health & Hum. Servs.*, No. 17-783V, 2018 WL 945834, at *1 (Fed. Cl. Spec. Mstr. Jan. 23, 2013); *Chinea*, 2019 WL 1873322, at *29; *but see Spayde v. Sec'y of Health & Hum. Servs.*, No. 16-1499V, 2021 WL 686682, at *18–19 (Fed. Cl. Spec. Mstr. Jan. 27, 2021) (concluding that 60-day onset satisfied *Althen* prong

three).[23]    As noted, this Court may not "'second guess' the special master's fact-intensive conclusions that are 'based upon [his] accumulated expertise in the field.'"  *Hinton*, 2025 WL 763153, at *2 (quoting *Hodges*, 9 F.3d at 961).

Further, the Chief Special Master did not rely solely on his "accumulated expertise" to reach his conclusion.  *Hodges*, 9 F.3d at 961.  His conclusion was also supported by the record, given that Petitioner did not file any medical literature supporting that an onset of vaccine-induced GBS beyond the generally accepted eight-week timeframe was medically appropriate, and that Petitioner's treating neurologist posited a different possible cause of his GBS.[24]  Pet. Ex. 3 at 2048

---

[23] The Court is not aware of any case in which a special master recognized an onset of longer than 60 days post-vaccination.  *See, e.g.*, *Redzepagic v. Sec'y of Health & Hum. Servs.*, No. 19-853V, 2025 WL 1147520, at *16 (Fed. Cl. Spec. Mstr. Mar. 19, 2025) ("Decisions in the Vaccine Program have gone out as far as two months or 60 days for vaccine-caused demyelinating illness.").  The cases in which special masters have recognized a 60-day latency period involved records readily distinguishable from the record here.  In *Spayde*, the special master concluded that prong three was satisfied even though January 12, 2014—the latest probable onset date—was approximately 60 days after petitioner's vaccination based on "persuasive testimony based on medical literature" from the petitioner's expert.  *Spayde*, 2021 WL 686682, at *18–19 ("While 60 days is four days outside the generally accepted timeframe of eight weeks, it is exceedingly close, and within a two-month calendar period."); *cf. Cooper v. Sec'y of Health & Hum. Servs.*, No. 18-1885V, 2024 WL 1522331, at *18–20 (Fed. Cl. Spec. Mstr. Mar. 12, 2024) (concluding that onset of GBS 60 days after Prevnar 13 vaccine satisfied *Althen* prong three).  In *Cooper*, the special master concluded that a 60-day onset satisfied prong three where petitioner framed his argument based on "two seminal studies" directly analyzing the onset issue, expert opinions, and "the admitting physician's assessment of the vaccine as a pertinent risk factor."  *Cooper*, 2024 WL 1522331, at *18–20 (noting that 60-day onset is "on the very edge of the entirely undisputed eight-week latency period").

[24] As described above, the Yale Medicine and Mayo Clinic articles both make several assertions regarding timing, but none undermine the reasonableness of the Chief Special Master's conclusion.  *See supra* Background § I.C.  Specifically, the Yale Medicine article notes that "[s]ymptoms can rapidly worsen in severity over hours or days and early treatment can considerably shorten the course of the illness," symptoms "may progress over the course of one to four weeks before leveling off," and are usually most severe within four weeks of symptom onset.  Yale Medicine at 1, 2, 4.  Similarly, the Mayo Clinic article notes that symptoms of weakness and tingling can "quickly spread" and "worsen rapidly," and that "[p]eople with Guillain-Barre syndrome usually experience their most significant weakness within two weeks after symptoms begin."  Mayo Clinic

(Dr. Bryarly noting that Petitioner's "respiratory illness may have been the inciting factor" for his GBS).  Said differently, Petitioner requested that the Chief Special Master make a finding that no other special master had made before, without providing medical literature or other compelling evidence to support such a finding.  The Chief Special Master also "articulated a rational basis" for declining to do so.  *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360); *see* Decision at 9–12.  When discussing Petitioner's Table claim, he took care to note that "[w]hen the record is read in its entirety, the evidence of a purportedly-earlier onset is thin, when compared to evidence of an onset in early January."  Decision at 11.  He supported this conclusion by explaining later in his analysis that Petitioner had not "convincingly . . . demonstrated" that the symptoms Petitioner claims occurred "within the well-established timeframe for vaccine-induced GBS" (eye symptoms, dizziness, back pain, and a cough) were GBS-specific, as those symptoms were "unrelated to his GBS, or reflect pre-vaccination conditions."[25]  *Id.* at 12; MFR. Mem. at 19; *see*

---

at 1, 3, 4.  Rather than frustrate the Chief Special Master's analysis, these articles bolster it, as they underscore the "acute" nature of GBS.  *See* Decision at 11.

[25] Petitioner focuses on two symptoms in particular—his eye symptoms and cough—which he concedes first occurred outside of the 3−42-day Table timeframe, but contends occurred within an appropriate timeframe to support an off-Table claim.  MFR Mem. at 13, 15−16.  *First*, regarding Petitioner's eye symptoms, the Chief Special Master reasonably concluded that those symptoms were not related to Petitioner's GBS, so the presence of those symptoms within six to eight weeks does not support Petitioner's claim.  *See supra* Discussion § I.B.1.  *Second*, regarding Petitioner's cough (which Petitioner posits first occurred on December 22, 2017 or December 25, 2017), the Chief Special Master noted that respiratory symptoms "do not reflect the kind of neurologic concerns that would stand as GBS's onset."  MFR Mem. at 15−16; Decision at 10.  This conclusion was reasonable, particularly because, as the Chief Special Master noted, Petitioner's neurologist opined that Petitioner's upper respiratory infection may have been the inciting factor for his GBS—which is not tantamount to being a symptom of it.  Decision at 4 (citing Pet. Ex. 3 at 2048); *see Cucuras*, 993 F.2d at 1528 ("Medical records, in general, warrant consideration as trustworthy evidence.").  In light of this fact, the abstract that Petitioner cites to support that "[c]ough and respiratory distress can be the presenting sign of GBS," (which was not filed separately as medical literature), does not assist Petitioner's off-Table claim.  MFR Mem. at 16 n.3.  To the extent that Petitioner argues that the other symptoms he identifies in his Motion—i.e., back pain and dizziness—occurred within a timeframe that could support an off-Table claim, those arguments

*supra* Discussion § I.B.  Thus, the Chief Special Master rationally explained that the weight of the evidence supported a finding of onset nine weeks after vaccination—a factual finding plainly within his purview—and buttressed his conclusion by invoking the generally accepted outer bound "for a similar non-Table claim in the [Vaccine] Program."  Decision at 12; *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360); *R.J. ex rel. W.J.*, 93 F.4th at 1235.

The Chief Special Master did not impermissibly impose a "hard and fast deadline . . . between vaccination and the onset of clinically apparent symptoms of neurologic injury."  *Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1383 (Fed. Cir. 2015).  Rather, here, the Chief Special Master simply recognized that eight weeks is generally the longest timeframe special masters have found to support a finding of vaccine causation.  Accordingly, he concluded that it was inappropriate to infer causation on the record before him, where Petitioner had failed to proffer preponderant evidence that "such an unusually lengthy post-vaccination onset" of nine weeks "could still be deemed medically acceptable."  Decision at 12.  Indeed, Petitioner failed to proffer any persuasive evidence—in the form of medical literature or otherwise—which could preponderantly prove that his GBS onset occurred within a medically acceptable timeframe to infer vaccine causation.  Absent such preponderant evidence supporting that—based on Petitioner's specific circumstances—a longer timeframe is appropriate, it was reasonable for the Chief Special Master to conclude that the timing prong of *Althen* had not been met.  *See Lampe*, 219 F.3d at 1366 ("In any event, a special master's task is to make a factual determination of causation based on the evidence in a particular case.").

---

fail for similar reasons.  As explained above, the Chief Special Master reasonably found Petitioner's contention that those symptoms marked the onset of his GBS "unpersuasive," based on "what is known" about GBS, Petitioner's medical records evidencing a history of back pain, and his physician's belief that his back pain, reported on December 20, 2017, was due to a "sprain/strain."  Decision at 11; *see supra* Discussion § I.B.2, 3.

Petitioner expresses concern that the Chief Special Master did not consider "that GBS does not present the same way in every Petitioner." MFR Mem. at 19. This concern is unfounded. The Chief Special Master did not conclude that GBS *could not* manifest in the manner in which Petitioner described; rather, he simply concluded that on record before him, Petitioner did not "persuasively establish[] circumstances" supporting "such an unusually lengthy post-vaccination onset." Decision at 12. In other words, the Chief Special Master concluded that Petitioner did not present sufficient evidence to support that Petitioner's GBS onset occurred when and how he argued that it did. This does not reflect a failure to recognize that GBS manifests differently in different patients. To the contrary, the Chief Special Master simply required Petitioner to do the requisite "heavy lifting" to prove causation-in-fact based on his specific circumstances, and concluded that Petitioner had not done so. *Id.* at 11–12; *Hodges*, 9 F.3d at 961; *Lampe*, 219 F.3d at 1366 ("In any event, a special master's task is to make a factual determination of causation based on the evidence in a particular case."). Petitioner states that "[i]t is unclear why Mr. Kindle's GBS needs to align with the 'vast majority of cases' when the scientific reality is that individuals have variation in vaccine-induced injuries." MFR Mem. at 20 (quoting Decision at 11). However, the best reading of the Decision is not that the Chief Special Master imposed such a requirement. Rather, the Chief Special Master simply concluded that Petitioner had failed to prove that his particular case deviated from the typical presentation of GBS. Decision at 11.

Lastly, Petitioner argues that "it would be illogical to believe that the day Mr. Kindle appeared at the VA and could not walk was when his symptoms first started." MFR Mem. at 16. But in fact, the QAIs—which set forth the statutory definition of GBS under the Vaccine Act— contemplate such a rapid onset. *See* 42 C.F.R. § 100.3(c)(15). Indeed, the QAIs *require* an "interval between onset and nadir of weakness between 12 hours and 28 days." *Id.*

§ 100.3(c)(15)(ii)(C).  The Chief Special Master's explanation of the course of Petitioner's onset—that it first manifested with a fall on January 5, 2018 and rapidly worsened over the course of the two following days—plainly fits within this definition and is supported by Petitioner's own medical literature.  Yale Medicine at 1 (noting that "[s]ymptoms can rapidly worsen in severity over hours or days").  The Decision reflects that Chief Special Master took care to consider and carefully analyze Petitioner's medical records and symptoms, and determined, based on the record and his "accumulated expertise in the field," that the onset of Petitioner's GBS took place over the course of three days in which Petitioner experienced significant weakness and fell multiple times as a result.  *Hinton*, 2025 WL 763153, at *2 ("The Vaccine Act makes clear that we do not 'second guess' the special master's fact-intensive conclusions that are 'based upon [her] accumulated expertise in the field.'" (quoting *Hodges*, 9 F.3d at 961)).

In sum, the Chief Special Master appropriately concluded that Petitioner's GBS onset occurred on January 5, 2018—65 days, or roughly nine weeks—after he had received the flu vaccine.  *See supra* Discussion § I.  Further, the Chief Special Master's conclusion that the symptoms Petitioner experienced earlier than January 5, 2018, had "not convincingly been demonstrated to be GBS-specific," and that Petitioner therefore had not proven a Table claim or causation-in-fact, was not arbitrary or capricious.  Decision at 12.  The Chief Special Master "considered the relevant evidence of record, dr[ew] plausible inferences and articulated a rational basis for the decision."  *Kirby*, 997 F.3d at 1381 (quoting *Lampe*, 219 F.3d at 1360).

The Chief Special Master limited his analysis of Petitioner's off-Table claim to the timing prong of *Althen* (prong three).  *See* Decision at 11−12.  This was proper, as failure to prove any one *Althen* prong is dispositive.  *Dobrydnev*, 566 F. App'x at 980.  Petitioner dedicates much of his supporting Memorandum to the "logical sequence of cause and effect" prong of *Althen* (prong

two), citing medical records which, he argues, reflect that his treating physicians associated his GBS to his flu vaccine.  *See* MFR Mem. at 15–19; *see also Althen*, 418 F.3d at 1278.  For the reasons explained above, this Court, in its "role of a reviewing judge," accepts the Chief Special Master's weighing of the evidence with respect to prong three.  *Munn*, 970 F.2d at 869.  Thus, the Court need not reach Petitioner's prong two arguments.  *Henkel*, 2024 WL 3873569, at *1 ("Because we conclude that the special master's finding on *Althen* prong three was not arbitrary or capricious . . . and because Appellants needed to prevail on all three prongs to have their petition granted, we affirm the petition's denial without reaching the prong-two finding."). [26]

---

[26] Even if Petitioner's arguments as to prong two were relevant, such arguments are nevertheless unpersuasive.  As an initial matter, this Court presumes—as it must—that the Chief Special Master considered the evidence Petitioner cites, because there is no indication in the Decision to the contrary.  *Moriarty*, 844 F.3d at 1328 (citing *Hazlehurst v. Sec'y of Health & Human Servs.*, 604 F.3d 1343, 1352 (Fed. Cir. 2010)); *see also* Decision at 9 ("The following factual findings are made after a complete and thorough review of the record, including all medical records, affidavits, and all other additional evidence and filings from the parties.").  Further, the records Petitioner cites in support of his prong two arguments are unpersuasive.  These records generally reflect Petitioner's own concerns about a possible connection between his flu vaccine and GBS—and his reticence to receive vaccines as a result of that belief—or merely note that Petitioner's GBS occurred after he received the flu vaccine.  MFR Mem. at 17−18 (citing Pet. Ex. 4 at 504, 736, 932, 979, 1018, 1339, 1393); *Cedillo*, 617 F.3d at 1347−48 (holding that a special master did not err in failing to afford significant weight to the opinions of treating physicians which "simply indicat[ed] an awareness of a *temporal*, not causal, relationship between" the vaccine and injury (emphasis in original)); *cf. Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994) (concluding that special master did not err by "requir[ing] the [expert] opinion to be more than unsupported speculation").  The other records cited by Petitioner that he contends reference a possible causal connection between Petitioner's flu vaccine and GBS were made by general physicians in 2021 and 2022, years after the onset of Petitioner's GBS—and, notably, after this case was filed.  MFR. Mem. at 17−18 & n.4 (citing Pet. Ex. 4 at 377, 440, 503, 1392); *see* ECF No. 1.  In contrast, as the Chief Special Master noted in the Decision, Petitioner's contemporaneous medical records reflect that Dr. Bryarly—a neurologist who treated Petitioner's GBS—instead suggested that Petitioner's upper respiratory infection may have been the underlying cause of his GBS.  Decision at 4 (citing Pet. Ex. 3 at 2048) (Dr. Bryarly noting on January 10, 2018 that Petitioner's "respiratory illness may have been the inciting factor" for his GBS)); *see also Cucuras*, 993 F.2d at 1528 (noting that medical records "warrant consideration as trustworthy evidence," in part because they are "generally contemporaneous to the medical events"); *Kirby*, 997 F.3d at 1382 ("*Cucuras* stands for the unremarkable proposition that it was not erroneous to give greater weight to contemporaneous medical records than to later,

## <u>CONCLUSION</u>

The Court laments the significant health consequences that Petitioner has suffered due to his illness.  While this Court empathizes with Petitioner, for the reasons stated above, the Court finds that the Chief Special Master's examination of the record in Mr. Kindle's case resulted in a decision that was not arbitrary or capricious.  The Chief Special Master's Decision dismissing Mr. Kindle's petition is therefore **SUSTAINED**, and Petitioner's Motion for Review (ECF No. 34) is **DENIED**.  The Clerk of the Court is directed to enter Judgment consistent with this Memorandum and Order.  The parties are directed to **CONFER** and **FILE** a Notice by **July 31, 2025**, attaching a proposed public version of this sealed Memorandum and Order, identifying any information subject to redaction pursuant to Vaccine Rule 18(b).

IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

---

contradictory testimony.").  Regardless, it was not necessary for the Chief Special Master to address Petitioner's prong two arguments, given the Chief Special Master's determination—which this Court concludes is not arbitrary or capricious—that prong three was dispositive in Petitioner's case.  *Henkel*, 2024 WL 3873569, at *1.